CARE AND PROTECTION OF QUINN
(and a companion case[1]).

No. 00-P-1788.

Suffolk. September 6, 2001. - March 6, 2002.

Present: JACOBS, GRASSO, & COWIN, JJ.

*Adoption,* Care and protection. *Due Process of Law,* Care and protection of minor. *Minor,* Care and protection. *Parent and Child,* Care and protection of minor. *Constitutional Law,* Self-incrimination.

In the circumstances of a care and protection proceeding resulting from an allegation that a father had severely beaten one of his children, a judge of the Juvenile Court did not abuse his discretion in declining to continue the proceeding until completion of the father's pending criminal case arising out of the beating; further, while it was permissible for the judge to draw a negative inference from the father's refusal to testify at the care and protection proceeding because of self-incrimination concerns, an examination of the judge's decision did not disclose that it had been derived with the assistance of negative inferences. [120-124]

In a care and protection proceeding, the record demonstrated clear and convincing evidence of the father's present unfitness to care for his children, and the judge, in reaching this determination, properly considered the father's recent criminal record, to the extent that it had a bearing on his fitness as a parent. [124-127]

PETITIONS filed in the Boston Division of the Juvenile Court Department on August 25, 1997.

The cases were heard by *Stephen M. Limon,* J.

*Patricia Quintilian* for the father.

*Brian Pariser* for Department of Social Services.

*Terry M. Craven,* for the children, was present but did not argue.

COWIN, J. On the basis of a severe beating of six year old Quinn and his eleven year old cousin, Andrew (a pseudonym), administered by Quinn's father with a cable cord and his fists, a beating witnessed by Quinn's seven year old sister, Maureen, a

---

[1]Care and Protection of Maureen. Both names are pseudonyms.

judge of the Boston Juvenile Court, pursuant to G. L. c. 119, § 26, adjudicated Quinn and Maureen to be in need of care and protection. The judge determined that the father "currently is unfit to assume parental responsibility for the subject children; and . . . that said unfitness is likely to continue into the indefinite future to a near certitude." Accordingly, he placed the children in the custody of the Department of Social Services (department) until they attained the age of eighteen, or until the department considered that the goal of the commitment had been accomplished.

The father's appeal rests in large part on the contention that the judge refused to continue the care and protection trial until completion of a pending criminal case arising out of the beating incident. That, the father argues, unfairly forced him to forgo testifying on the subject of his fitness as a parent out of concern that his testimony might be used against him in the criminal case. In a related claim, the father asserts that the judge, having placed him in a position in which he was unable to testify, then wrongly drew negative inferences against him by virtue of his failure to present evidence. In addition, the father argues that, even on the record as it existed without the father's testimony, it was not shown by clear and convincing evidence that the father was unfit. We hold that the judge did not abuse his discretion in refusing to continue the trial; that he drew no impermissible inferences from the father's failure to testify; and that his determination that the children were in need of care and protection was warranted by the evidence. Accordingly, we affirm the judgments.

1. *Prior proceedings.* We review the relevant prior proceedings, leaving for later portions of this opinion the material facts. The case commenced with the filing by the department of a care and protection petition with respect to five children born to the mother and multiple fathers. The mother was found to be unfit to parent any of the children,[2] and custody of the two children who are the subject of this appeal was awarded to their biological father. Subsequently, however, the department requested emergency custody of the two children based on an allegation of the abuse described above, i.e., the father had abused Quinn

---

[2]The mother has not appealed.

and his cousin, Andrew,[3] by striking them and inflicting injuries. Following a seventy-two hour hearing pursuant to G. L. c. 119, § 24, a judge found the children in need of care and protection and placed them temporarily in the custody of their paternal aunt.

Simultaneously, as a result of the beating he inflicted on the children, the father was indicted by a Suffolk County grand jury for abuse of a child, assault and battery, and assault and battery by means of a dangerous weapon. Those charges were pending on April 4, 2000, when trial on the merits of the care and protection petition was scheduled to commence in the Juvenile Court. On that date, the father requested that the trial be continued, citing as reasons the pendency of the criminal case and his reluctance to risk self-incrimination by virtue of testimony he might give in the care and protection proceeding. When considering the request, the Juvenile Court judge was informed by the department's trial counsel that the judge presiding over the criminal proceeding was unwilling to go forward until the care and protection proceeding had been completed.[4] The father sought leave to testify with respect to his abilities as a parent while asserting his privilege against self-incrimination with respect to the subject matter of the criminal case. The judge responded that, if the father testified, the father could be cross-examined on any relevant issue and that, if he asserted the privilege, his testimony would be stricken. The judge denied the father's motion for a continuance, and the father chose not to testify.

The judge found that the father had engaged in an inappropriate pattern of discipline of the children; that his attitude toward corporal punishment had not been altered; and that that attitude, together with his history of violence, established that the

_____

[3]The father did not have custody of Andrew, and Andrew is not a subject of this proceeding.

[4]It was represented that the Superior Court judge desired to await the outcome of the care and protection case because a decision whether the father was to have custody of the children might influence a disposition in the criminal matter, i.e., if the father were awarded custody and subsequently found guilty, incarceration of him would create problems and the sentencing judge might, in the exercise of her discretion, avoid such a result. We assume that counsel accurately represented the views of the Superior Court judge to the extent that she was familiar with them.

children would be endangered if returned to his custody. He adjudicated the father currently unfit to parent the children and awarded custody of them to the department.

2. *The father's failure to testify.* The essence of the father's objection to the denial of his request for a continuance is that he was forced to choose between his constitutional privilege not to give incriminating testimony against himself and his ability to participate fully and effectively in a proceeding that threatened to interfere with another of his rights, the right to custody of his biological children. The criminal and civil proceedings, the father continues, became "inextricably intertwined" both because they arose as a result of the same incident and because of the refusal of the juvenile judge to defer to the criminal proceeding (as well as the concomitant refusal of the Superior Court judge to go forward). He argues that the prejudicial "intertwining" should have been avoided by deferring the juvenile proceeding and that, at a minimum under such circumstances, his constitutional privilege against self-incrimination should attach to the care and protection case. If so, this would have precluded the Juvenile Court judge from drawing inferences adverse to him as a result of his failure to testify.

Whether to continue any judicial proceeding is a matter entrusted to the sound discretion of the judge, and his decision will be upheld absent an abuse of that discretion. See *Mowat* v. *Deluca*, 330 Mass. 711, 712 (1953); *Adoption & Visitation of a Minor*, 14 Mass. App. Ct. 992, 993 (1982). Under ordinary circumstances, a decision not to postpone a normally scheduled trial, including a trial in a care and protection case, would be relatively immune from appellate second-guessing. The issue we are called upon to address is whether the abuse of discretion analysis in this case is to be influenced by the father's assertion that the government forced him to choose between participating in the case involving custody of his children and exercising his privilege to refuse to give testimony that might prejudice him in the corollary criminal proceeding.

While "important personal rights, such as those involved when the breakup of a family is threatened, warrant an extra measure of evidentiary protection," *Custody of a Minor (No. 1)*,

377 Mass. 876, 884 (1979), constitutional rights which normally attach in criminal proceedings are not automatically available in cases involving care and protection or dispensation with consent to adoption. *Adoption of Don*, 435 Mass. 158, 169 (2001). *Adoption of John*, 53 Mass. App. Ct. 431, 435 (2001). See *Custody of a Minor*, 375 Mass. 733, 746 (1978) (double jeopardy doctrine not applicable); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 384 Mass. 707, 710-711 (1981) (exclusionary rule inapplicable); *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 392 Mass. 696, 699 (1984) (findings not required to be beyond a reasonable doubt); *Adoption of Don, supra* (right to face-to-face confrontation not required); *Adoption of John, supra* (judge not required to engage in a colloquy similar to that required in criminal cases when a parent enters into an agreement for judgment). Of direct relevance to the present case is the holding in *Custody of Two Minors*, 396 Mass. 610, 617 (1986), that the privilege against self-incrimination is not available.

This of course does not mean that a witness may not assert his self-incrimination privilege if called upon to testify in a care and protection proceeding or in any other civil case. He may do so, as the father did here. It means only that that assertion does not prevent opposing counsel from commenting on the defendant's choice not to testify or the factfinder from drawing a negative inference therefrom, both of which protections attach in a criminal case. "[W]e . . . hold that the privilege against self-incrimination applicable in criminal proceedings, which prevents the drawing of a negative inference from a defendant's failure to testify, is not applicable in a child custody case." *Ibid.*

In deciding the father's motion to continue the care and protection trial, the judge did not act in a vacuum, but instead acted in the light of the existing and applicable legal principles set forth above: specifically, that the request for a continuance was addressed to his discretion; that the father was constitutionally entitled not to testify at the trial; but that the judge was free to draw appropriate inferences from a refusal to testify. He was not required automatically to grant the request. "[T]he assertion of the privilege by a party in a civil case does not require the court to issue a blanket injunction staying the future course of

the litigation. Nor is there a constitutional requirement that the civil proceeding must yield to the criminal one." *United States Trust Co. of N.Y.* v. *Herriott,* 10 Mass. App. Ct. 313, 316 (1980). On the other hand, the judge should "balance any prejudice to the other civil litigants which might result from granting a stay, against the potential harm to the party claiming the privilege if he is compelled to choose between defending the civil action and protecting himself from criminal prosecution." *Id.* at 317.

In the circumstances of this case, the juvenile judge did not abuse his discretion in declining to continue the care and protection trial. The father's request was presented orally on the day trial was scheduled to commence and without an accompanying affidavit. Other interests, specifically the paramount interests of the children involved, argued against delay. "Speedy resolution of cases involving issues of custody or adoption is desirable . . . ." *Adoption of Emily,* 25 Mass. App. Ct. 579, 581 (1988). Given the unhappy vagaries which sometimes accompany the criminal process, the judge could by no means be certain that the father's criminal case would conclude within a reasonable period of time. Indeed, the judge was informed that the judge presiding over the criminal case had refused to go forward in advance of completion of the care and protection proceeding. See *supra* at 119.

The consequence of the judge's refusal to postpone the trial, and the father's resulting decision to forgo testifying because of self-incrimination concerns, was, according to the father, that he was unable to submit evidence that his parenting skills had improved and that therefore he was presently a fit parent. While we address the subject further below, we note here only that the judge could reasonably have concluded that such information could have been presented by other witnesses or documentation without Fifth Amendment implications. The father had an opportunity to be heard at a meaningful time and in a meaningful manner. See *Adoption of Hugh,* 35 Mass. App. Ct. 346, 347 (1993). Compare *Adoption of Edmond,* 50 Mass. App. Ct. 526, 529-530 (2000); *Adoption of Whitney,* 53 Mass. App. Ct. 832, 836-839 (2002). He was entitled not to avail himself of that opportunity, but was not, at least on these facts, entitled to have the judge accommodate both his desire to testify and his desire

to remain silent. There was no abuse of discretion, particularly given the fact that a custody determination, as opposed to a final termination of parental rights, was involved. See *Custody of Michel*, 28 Mass. App. Ct. 260, 270 (1990).[5]

3. *Inferences from the father's failure to testify.* The father attacks the outcome of the care and protection proceeding as one influenced by negative inferences drawn by the judge because of the father's failure to testify. Our discussion in part 2, *supra*, disposes of this contention. If it were proper to conduct the trial (as opposed to granting the request for a continuance), it was proper to draw appropriate inferences from the fact that the father presented no testimony. "The unique characteristics of child custody proceedings do not require alteration or modification of the rule permitting inferences from a party's failure to testify in a civil case." *Custody of Two Minors*, 396 Mass. at 616.

The father's contention on this issue is particularly unpersuasive when the negative inferences allegedly drawn by the judge are examined. It was the father's position that, while he may have been violent in the past, by the time of trial, he had, by means of classes and otherwise, learned to curb that tendency, and that therefore he was no longer unfit. As indicated, he argues that the judge drew negative inferences on this subject matter, i.e., the judge concluded that he had not really reformed because of his failure to testify.

Granted, the judge signaled that he was applying a negative inference by setting forth in his decision the proposition that the drawing of a negative inference from a parent's failure to testify is permissible, at least where the court does not treat the inference as by itself sufficient to sustain the petitioner's burden to prove lack of fitness. However, an examination of the judge's decision does not disclose that it had been derived with the assistance of negative inferences.

Rather, the judge notes only that the father did not testify after the court declined to limit cross-examination. The judge

---

[5]At the time of the order under review, long-term goals for the children had yet to be established. Consequently, reunification with the father remained a possibility in the event it was subsequently determined that he had become fit to assume parental responsibilities.

also stated that the father elected not to testify. He then continued: "I therefore, have no way to assess the possible positive impact of the classes taken by father on his predisposition toward violence and the use [of] corporal punishment against his children. In the absence of any credible evidence to the contrary, I conclude that the children would continue to be at risk in his care." We do not perceive this to be the drawing of a negative inference. The statement reflects only an accurate evaluation of the contents of the record, specifically that there was evidence that the father had been violent in the past and, though he had taken classes, there was no evidence that he had overcome that propensity. See *Adoption of Mario*, 43 Mass. App. Ct. 767, 773 (1997). No inferences were necessary to make the findings at issue. Thus, whether the judge's reference to the father's failure to testify is deemed a permissible negative inference or no inference at all, there was no error.

4. *Sufficiency of the evidence of unfitness.* The father attacks the judge's determination that he is presently unfit to parent the children as unsupported by the evidence notwithstanding the father's decision not to testify. Having reviewed the record and having applied the requirement that findings will not be disturbed unless clearly erroneous, see *Adoption of Paula*, 420 Mass. 716, 729 (1995), we conclude that, taken together, the findings here support the judge's decision by clear and convincing evidence. See *ibid.*; *Adoption of Don*, 435 Mass. at 167.[6]

There does not appear to be a material dispute with respect to the judge's subsidiary findings. The children came to the attention of the department on several occasions between 1995 and 1997 by virtue of reports that their mother was negligent in supervising them, was a drug abuser and maintained a totally inadequate home environment for young children. The children were removed from the mother's custody on August 25, 1997.

The father had a criminal record punctuated by acts of violence. His record includes convictions on three counts of as-

---

[6]Subsidiary findings need be based only on proof by a fair preponderance of the evidence. See *Care & Protection of Laura*, 414 Mass. 788, 793 (1993). However, they must be specific and detailed, and demonstrate that the ultimate decision has not been influenced by inappropriate factors. See *Care & Protection of Three Minors*, 392 Mass. 704, 712 (1984).

sault with a dangerous weapon and possession of a firearm (1989); unlawful possession of a class B substance (1992); assault and battery on a police officer and manufacturing a class B substance (1993); and operation of a motor vehicle with a suspended license (1997). The sentence on the last offense was suspended, and he was placed on probation, which he violated.

On August 23, 1999, the father disciplined Quinn and his cousin, Andrew, by beating them with a cable cord and his fists. The beating inflicted injuries on both children, leaving Quinn two days later with scabs on his ear and neck, while Andrew at the same time was left with red marks and scabs on his stomach, arm, back, and neck. The beatings were witnessed by Maureen, making her fearful that she might receive the same treatment. The father admitted that this was his usual method of disciplining the children and expressed anger when told by investigators that he could not discipline the children in this manner.

A department investigator created a safety plan for the children which called for Quinn and Andrew to be taken to the hospital to have their injuries examined and treated. The plan expressly provided that the father was not to take the children because he had caused the injuries. The father ignored this restriction, took Quinn and Maureen to the hospital, but did not take Andrew.

The father attended a batterers' intervention program and completed a parenting class. As set forth above, no evidence was presented regarding the impact, if any, of these programs on his parenting skills in general or his attitude toward violent corporal punishment in particular. See *Adoption of Mario*, 43 Mass. App. Ct. at 773. The judge found that the father's use of corporal punishment far exceeded what was permissible; that he had a history of violence; that there was an absence of evidence that his attitude toward extreme forms of physical discipline had changed; and that, consequently, the children would be placed at substantial risk if left in his care.

These determinations were warranted. Evidence of the father's criminal record, to the extent that it had a bearing on his fitness as a parent, is germane in care and protection proceedings. See *Care & Protection of Frank*, 409 Mass. 492, 494 (1991). Here, the father had been convicted of crimes which

reasonably led the judge to conclude that he had a propensity for violence. That propensity was apparent during the beating of his children. The severity and effects of the attack are much greater than the discipline described in *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. 385, 390-395 (1999). Even in *Cobble*, the Supreme Judicial Court stated that "a method of corporal punishment similar to the plaintiff's could, in different circumstances, rise to a level of severity that would result in the actual infliction of impermissible injuries or, alternatively, warrant a rational inference that it posed a substantial risk that such injuries would result." *Id.* at 395. The judge could supportably find that that was the case in the present proceeding.

While stale information cannot be the basis for a finding of present unfitness, "[p]rior history . . . has prognostic value." *Adoption of George*, 27 Mass. App. Ct. 265, 268 (1989). Furthermore, this prior history is hardly stale. The father's record of criminal convictions, characterized as it is by offenses involving both violence and forms of irresponsibility unlikely to translate into adequate parenting, ends as recently as 1997 (this trial was in April, 2000), in addition to a subsequent violation of a probation imposed as a result of one of those offenses. The beating in question, as well as the father's expression of anger at the suggestion that the discipline was excessive, occurred in August, 1999. Further, the father failed on his own to obtain medical treatment for the children following the beating, doing so only when a department investigator demanded that the children be taken to a doctor, and then violating the directive by taking only one of the injured children and transporting him himself.

Contrary to the father's assertion, the judge did not ignore evidence regarding the father's effort to improve. The judge noted the father's recent participation in programs, but stated "there is no evidence that father's longstanding attitude regarding the use of corporal punishment has changed." This reflects an accurate assessment of the record. "The judge was not obliged to believe that the parenting skills of . . . the father had improved simply because of [his] recent cooperation with the department, or that [his] good intentions eliminated risk of

future abuse." *Adoption of Lorna*, 46 Mass. App. Ct. 134, 143 (1999).

Absent evidence that the father has in fact altered his behavior and attitude, the judge was not required to put the welfare of these children at risk. His determination of present unfitness was warranted. Should the father have evidence that he has subsequently become fit, he is free to present it in the periodic review to which he is entitled under G. L. c. 119, § 26. See *Custody of Deborah*, 33 Mass. App. Ct. 913, 914 (1992).

*Judgments affirmed.*