NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-1048                                        Appeals Court


ADOPTION OF URSA (and a companion case[1]).


No. 22-P-1048.

Suffolk.      September 6, 2023. - November 29, 2023.

Present:  Massing, Grant, & Brennan, JJ.


Adoption, Dispensing with parent's consent, Visitation rights.
     Minor, Adoption, Visitation rights.  Parent and Child,
     Dispensing with parent's consent to adoption.  Practice,
     Civil, Adoption.  Department of Children & Families.
     Indian Child Welfare Act.  Constitutional Law, Self-
     incrimination.  Evidence, Child custody proceeding.
     Witness, Self-incrimination.



     Petition filed in the Barnstable County/Town of Plymouth
Division of the Juvenile Court Department on April 9, 2018.

     Following transfer to the Suffolk County Division of the
Juvenile Court Department, the case was heard by Maura Hardiman,
J.


     Natalie K. Hoppel for the mother.
     Kristin S. Braithwaite for Department of Children and
Families.
     Daniel R. Katz for the children.


_____

     [1] Adoption of Michael.  The children's names are pseudonyms.

MASSING, J.  In this tragic case, a toddler's death resulted in the mother being indicted for, and eventually pleading guilty to, manslaughter and reckless endangerment. While the criminal case was pending, proceedings for care and protection of the mother's six other children went forward. This appeal concerns the Juvenile Court decrees terminating the mother's parental rights as to her two youngest children, a twin daughter and son, Ursa and Michael.  The mother asks us to vacate the decrees on the ground that the trial judge did not adequately investigate whether the twins were subject to the Indian Child Welfare Act, 25 U.S.C. §§ 1901 et seq. (ICWA).  The mother also argues that the judge abused her discretion by failing to continue the trial while the criminal case against her was pending, and that because the Department of Children and Families (department) acted as an agent of the prosecution, it was error for the judge to consider the mother's failure to engage with the department in the determination of the mother's unfitness.  The mother also challenges the judge's sibling visitation order and the judge's decision not to order posttermination or postadoption visitation with the mother or the maternal grandmother.  Discerning no error or abuse of discretion, we affirm.

Background.  We summarize the trial judge's findings of fact, which are not disputed.  The subject children, born in

2018, are the twins. The mother and the twins' father[2] were also the biological parents of Amy,[3] who was born in 2017 and died in 2019. The mother has four older children, born in 2007, 2010, 2013, and 2015, each with a different father. The four older children were the subjects of a separate care and protection proceeding, the judge having denied the department's motion to consolidate. A panel of this court affirmed the decrees terminating the mother's parental rights with respect to those children in an unpublished decision pursuant to our Rule 23.0. See Adoption of Irma, 103 Mass. App. Ct. 1106 (2023).

The mother's extensive history with the department started in 2007, when the children's maternal grandmother struck the mother in the presence of the mother's oldest child, who was six months old at the time. The mother has since been the subject of approximately thirty reports filed pursuant to G. L. c. 119, § 51A (51A reports), alleging neglect of the children based on domestic violence, mental health problems, behavioral issues, and criminal activity. About one-half of the 51A reports were

---

[2] The judge also issued decrees terminating the father's parental rights with respect to the twins. The father has not appealed.

[3] A pseudonym.

supported, screened in, or resulted in the department conducting investigations under G. L. c. 119, § 51B (51B investigations).[4]

The mother and father met in 2016, and their relationship soon turned volatile and violent. Police officers responded to at least ten domestic violence reports involving the couple in 2016 alone, and at least fifteen the following year. Such reports included "threats to do harm, larceny, burglary, violations of active restraining orders, and verbal and physical abuse." The mother and the father also obtained abuse prevention orders against each other. The department became concerned about the children's exposure to the violence, and police responses that permeated the relationship. The mother's conflict with the father aligned with her well-documented antagonism toward neighbors, family members, previous boyfriends, and department employees. The judge found that the mother "had a long history of domestic violence as a spectator, victim and perpetrator of abuse . . . in most of her relationships, including with [the twins' f]ather and the other fathers of her children."

---

[4] There are limits on the proper evidentiary use that can be made of the contents of 51A reports and 51B investigation reports. See Adoption of Luc, 484 Mass. 139, 149-154 (2020); Mass. G. Evid. § 1115(b)(2) (2023). The mother makes no claim that the judge considered the reports for improper purposes.

In June 2017, in violation of an active abuse prevention order, the father arrived at the mother's home and demanded to see Amy, then two months old.  Soon after he entered the home, the father allegedly strangled the mother.  The oldest child, then ten years old, called 911.  The department conducted a 51B investigation with which the mother refused to cooperate.  She denied that the incident occurred, that her daughter called 911, or that she and the father had any history of domestic violence. The mother repeatedly threatened violence against department social workers during the investigation, even threatening to kill a worker and the worker's child.  The department filed a care and protection petition and obtained custody of the mother's five children.

In early 2018, while the children remained in the department's custody, the mother gave birth to Ursa and Michael. They were born prematurely at thirty-two weeks gestation and admitted to the neonatal intensive care unit of the hospital with numerous concerning conditions.  The father was present at the hospital for their birth, although he did not establish paternity for another two years.  On discovering the mother's history of department involvement and of incidents of domestic violence involving the father, hospital staff filed a 51A report.  In the subsequent investigation, the mother and father both denied that the father had been at the hospital during or

after the twins' birth, and the mother denied having had any contact with the father since the June 2017 assault.  Hospital records showed, to the contrary, that both parents wore parent identification bands, the father identified himself to the doctor and medical staff as "the father of the children," and the father visited the hospital at least twice after the twins were born as they received ongoing medical care.  The judge found that the mother and the father "maintained contact throughout 2017 and 2018 and continued to engage in domestic violence."  The department filed a care and protection petition for Ursa and Michael about three weeks after they were born, obtained emergency custody before they were discharged from the hospital, and placed them in short-term foster care.  The following month, the department placed them in a long-term foster home, where they developed a strong bond with their foster family.

The mother began to engage with department services and to exhibit positive behaviors in early 2019.  The department changed the children's goals from adoption to reunification with the mother following a permanency planning conference in May 2019.  The mother participated in a biweekly parent aide service provided by the department that helped the mother develop fundamental parenting skills, provided some of the children with in-home therapy, and supplied the department with weekly updates

about the family.  The department reunited Ursa and Michael with the mother in September 2019 in light of her cooperation and progress on her action plan.  By late December 2019, the mother had regained custody of all seven children.

Reunification lasted little more than a week.  Between December 20 and 27, 2019, the mother contacted the department several times to express concerns about Amy, then age two, exhibiting "unusual" behavior.  On December 26, the mother reported that Amy was "head banging, scratching herself, wide eyes staring off, replying 'yes' to everything and having accidents on the furniture."  The next day, after the mother reported that Amy was scratching herself more and had become more reserved, a department social worker strongly advised the mother to seek medical attention for Amy and to speak to a family therapist.  The mother agreed, but when Amy exhibited symptoms of distress around 11:50 P.M. that night, the mother sent a text message to the social worker instead of calling 911.

The mother finally called 911 around midnight or early in the morning on December 28 and reported that Amy was unresponsive and could not be heard breathing.  The 911 operators instructed the mother to rub Amy's chest while awaiting the ambulance.  By the time an ambulance arrived, Amy was not breathing and had no heartbeat.  Police arrived to find Amy wrapped in a blanket and propped up on the couch, which

indicated that the mother had not followed the 911 operators' instructions. The other children watched as emergency responders restarted Amy's heart. Amy remained unconscious as the first responders rushed her to the local hospital, where she arrived in critical condition with visible bruises on her neck, ribs, and the back of her head. A computed axial tomography (CAT) scan suggested she had suffered nonaccidental trauma. Amy was then airlifted to Boston Children's Hospital (BCH) at about 2:45 A.M., where she was placed on life support and diagnosed with nonaccidental abusive head trauma. The mother became emotional as she said goodbye to Amy just before the airlift. She expressed concern about Amy's condition and was cooperative with medical staff. The department placed the other children in foster care so the mother could stay with Amy in the hospital.

The treating physicians at BCH observed that Amy "had a subdural hematoma, increased cerebral edema, scattered retinal hemorrhage in the right eye from non-accidental, abusive head trauma and hypoxia." Dr. Celeste Wilson, a member of BCH's child protection team who evaluated Amy for signs of abuse, testified that Amy's head-banging behavior could not account for either her ultimately fatal subdural hematoma or for her retinal hemorrhaging. After being declared brain dead, Amy remained on a ventilator to allow time for her family to say goodbye. She

was removed from the ventilator and pronounced dead at 3 P.M. on December 31.

Ursa and Michael experienced Amy's medical emergency, the police and emergency medical response, removal and separation from the mother and their siblings, and Amy's death. They lived in a local foster placement as the department searched for relatives willing or able to adopt them. The department returned Ursa and Michael to their previous foster family in late February 2020; they appeared to thrive on their return, although Ursa exhibited some behavioral issues and attended a program at Boston Medical Center for children who witness violence.[5]

The mother was charged with and later indicted for manslaughter and reckless endangerment of a child. Her bail was revoked in September 2020 after she cut off her global positioning system device and threatened a neighbor. As to the care and protection case involving the twins, the mother ceased all participation with department services; her interactions with department staff once again became hostile and confrontational. The judge also found that the mother "was not

---

[5] The judge determined that the department's plan for the twins to be adopted was in their best interests, but not necessarily by the foster family, as evolving circumstances at the time of trial suggested that adoption by the paternal grandmother might be a viable and preferable option.

engaged in services [available in jail] while incarcerated, including mental health or domestic violence services." The mother had no contact with the twins after Amy's death, in part because of court orders in the criminal case, and in part because the department made the decision not to support any contact between the mother and any of the children. At trial in the care and protection matter, the mother invoked her privilege under the Fifth Amendment to the United States Constitution and declined to testify, which led the judge to draw a number of negative inferences about her lack of engagement in services and responsibility for Amy's death.

We take judicial notice that on May 31, 2023, the mother pleaded guilty in Superior Court to manslaughter and reckless endangerment of Amy. See Jarosz v. Palmer, 436 Mass. 526, 530 (2002). She was sentenced to a State prison term of three to four years, with 654 days of jail-time credit, followed by a five-year term of probation.

Discussion. 1. The ICWA. The mother claims that the trial judge erred by ignoring evidence of the twins' status as Indian[6] children and failing to conduct her own ICWA inquiry in addition to the department's. The ICWA, when applicable,

---

[6] We use the term "Indian" for consistency with the ICWA, mindful that the terms "Native American" and "Indigenous" are preferred by many.

triggers a heightened evidentiary standard and burden of proof for termination of parental rights.  See Haaland v. Brackeen, 143 S. Ct. 1609, 1632 (2023); id. at 1646 (Gorsuch, J., concurring); Adoption of Leonard, 103 Mass. App. Ct. 419, 422 (2023).

The mother did not raise her ICWA claim at trial.  She asserts that Federal law allows an Indian parent or tribe at any time to "petition any court of competent jurisdiction to invalidate [any action for termination of parental rights] upon a showing that such action violated any provision of sections 1911, 1912, and 1913" of the ICWA.  25 U.S.C. § 1914. Acknowledging the ICWA's important policy objectives, as well as the importance of finality in child custody proceedings, we assume without deciding that the mother's challenge is properly before us.  In light of the scant evidence that the ICWA might apply and the overwhelming evidence that it did not, we discern no error.

Congress enacted the ICWA in 1978 "out of concern that 'an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'"  Haaland, 143 S. Ct. at 1623, quoting 25 U.S.C. § 1901(4).  "The cultural biases leading to unwarranted terminations of parental rights, when coupled with the failure to recognize the crucial interest that tribes

have in the placement of Indian children within their tribes, threatened continuing tribal viability.  The ICWA was the legislative response."  Adoption of Arnold, 50 Mass. App. Ct. 743, 748 (2001).

A child subject to adoption or parental termination proceedings may qualify as an "Indian child" under 25 U.S.C. § 1903(4) by being "a member of an Indian tribe," § 1903(4)(a), or being both "eligible for membership in an Indian tribe and . . . the biological child of a member of an Indian tribe," § 1903(4)(b).  See 81 Fed. Reg. 38,778, 38,804 (June 14, 2016) ("Indian child" inquiry "is focused on only two circumstances: [1] Whether the child is a citizen of a Tribe; or [2] whether the child's parent is a citizen of the Tribe and the child is also eligible for citizenship").  "[W]here the court knows or has reason to know that an Indian child is involved, the party seeking the foster placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and their right of intervention."  25 U.S.C. § 1912(a).

The judge must affirmatively inquire whether a child is an Indian child.  See 81 Fed. Reg. 38,778, 38,805.  The inquiry should be made "at the commencement of the proceeding and all responses should be on the record."  25 C.F.R. § 23.107(a).  An

early ICWA inquiry "avoids the problems and inefficiencies generated by late identification that ICWA is applicable to a particular case." 81 Fed. Reg. 38,778, 38,804.

Here, the first judge assigned to the twins' care and protection proceeding promptly dispatched her duty to ascertain the twins' ICWA status. Docket entries in the care and protection proceeding dated April 30, 2018 -- twenty-one days after the department filed its petition -- document the mother's presence in court and the judge's ICWA inquiry: "Court inquired as to whether the parties know or have reason to know that the child is an Indian child subject to ICWA. . . . Parties respond no as to knowing or having reason to know that the child is an Indian child subject to ICWA." "Docket entries import incontrovertible verity and stand as final unless corrected by the court" (quotation and citation omitted). Commonwealth v. Denehy, 466 Mass. 723, 727 (2014). A judge's determination of an issue on the docket is conclusive "absent a showing that the court has intentionally falsified the record." Zabin v. Picciotto, 73 Mass. App. Ct. 141, 172 (2008), quoting Burda v. Spencer, 28 Mass. App. Ct. 685, 689 (1990). The mother provides no reason, and we see no reason, to question these docket entries.

The mother correctly notes that the trial judge, who was assigned to the case after the intradepartmental transfer of the

case from Plymouth to Suffolk County, did not include a second ICWA inquiry.  As the transfer order called for the case to "proceed in the [Suffolk County] court as if originally commenced therein," the first judge's ICWA colloquy remained in full force and effect.  Without additional "reason to know" that the twins might be Indian children, further inquiry was unnecessary.

The mother argues that the record presented evidence of an Indian affiliation that gave the trial judge "reason to know" and a corresponding duty to conduct further inquiry.  We have previously construed the scope of the "reason to know" requirement by looking to persuasive precedent from other jurisdictions.  For example, we looked to Oregon case law to hold that there was no reason to know that the children were Indian children where they and the mother were initially designated as Caucasian, and the father as Hispanic.  See Adoption of Arnold, 50 Mass. App. Ct. at 749-750, discussing State ex rel. Juvenile Dep't v. Tucker, 76 Or. App. 673 (1985).  In this case, we likewise look to other State court decisions for guidance.

Given the ICWA's history and policy objectives, courts construe the statute liberally in favor of tribal membership.  Accordingly, a "specific claim of Native ancestry" may alone qualify as a reason to know.  See Jimmy E. v. State, 529 P.3d

504, 516 (Alaska 2023), citing Matter of Z.J.G., 196 Wash. 2d 152, 175-176 (2020). A reason to know can be as minimal as a parent's "asserted belief that [he or] she may be eligible for enrollment in" a tribe. Matter of S.R., 394 Mont. 362, 377 (2019). Construing "reason to know" broadly facilitates notice to the tribes and upholds their plenary authority over tribal membership. See Matter of Z.J.G., supra.

However, a "reason to know" must be specific enough to suggest that the parent or child is likely enrolled or eligible to be enrolled in a particular tribe; it "requires something more than a bare, vague, or equivocal assertion of possible Indian ancestry without reference to any identified Indian ancestors with a reasonably suspected tribal connection." Matter of S.R., 394 Mont. at 377. See Matter of Jeremiah G., 172 Cal. App. 4th 1514, 1520 (2009). For example, a judge has "reason to know" that a child is an Indian child if a party or an Indian tribe or organization informs the judge that the child is in fact an Indian child; if information indicating that the child is an Indian child is discovered; if the child, a parent, or an Indian custodian lives on a Native American reservation or Alaska Native village; if the child is or has been a ward of a tribal court; or if either parent or the child has an identification card indicating tribal membership. See 25 C.F.R. § 23.107(c).

The earliest reference to the ICWA in the record of this case appears in a 51B investigation report from June 2017, before the twins were born, but after the birth of Amy, who had the same mother and father:  "Mother denied that she or the children have any [I]ndian or tribal affiliation."  Because Amy and the twins had the same biological parents and were too young to develop any tribal affiliation on their own, the twins' tribal affiliation, if any, would be the same as Amy's.

The 51A intake report prepared just after the twins' birth provides no information about the twins' ICWA status, and lists their race as "Unable to Determine," but with respect to each of Amy, the four older children, and the mother, includes the notations "ICWA . . . No" and "Race . . . Black."  A November 2020 family assessment states, "The family is Black and they speak English.  [The mother and the twins' father] deny Native American affiliation."  For some reason not apparent on the record, however, the same family assessment notes a Cherokee tribal affiliation and states that the department sent an ICWA notice or notices on behalf of all seven children in October 2018.  In response, the tribes "report[ed] family ineligible for enrollment.  ICWA does not apply."  A tribal determination of a child's eligibility for tribal membership is conclusive as a

matter of law.  See Matter of S.R., 394 Mont. at 375, citing 25

C.F.R. § 23.108(b).[7]

Moreover, no information presented at trial suggested that

the twins' family identified as an Indian family or had Native

American ancestry.  When presented with opportunities to discuss

their racial identities at trial, both the mother and father

affirmatively identified as Black and did not hint at any Native

American roots.  During a verbal outburst on the first day of

trial, the mother testified, "I'm an innocent Black woman,

okay?"  The father testified that he was "African-American" and

expressed concern about the twins not being raised by a Black

family.

-------

[7] The department should have filed or included in the trial record of the twins' care and protection case an original or a copy of the notice or notices sent to each tribe, together with proof of service, as well as the tribes' responses.  See Adoption of Uday, 91 Mass. App. Ct. 51, 52-53 (2017); 25 C.F.R. § 23.111(a)(2).  We take judicial notice, based on the docket entries of the Juvenile Court and of this court, that such documentation was filed in the related case concerning the mother's four older children, which was tried almost simultaneously with the twins' case and by the same judge.  See Jarosz, 436 Mass. at 530 ("a judge may take judicial notice of the court's records in a related action").  However, judges are not permitted to take judicial notice of evidence introduced in a different case, even if closely related.  See Care & Protection of Zita, 455 Mass. 272, 283 (2009); Mass. G. Evid. § 201(b) note (2023).  The department's failure to file the notices and responses concerning the twins in their case was error, but the mother does not raise this error in her brief, nor do we find it fatal to the adjudication of the mother's ICWA claim.

The mother's ICWA claim rests on three exhibits, copies of 51A intake reports all dated December 28, 2019, that include the notation "ICWA . . . Yes" with respect to the twins, Amy, and three of the four older siblings.  The mother never brought this information to the trial judge's attention, and the trial judge cannot be faulted for failing to search through every page of the voluminous record to find a needle in the haystack.  However, even if the judge had been made aware of these notations, in light of the record as a whole, this type of bare assertion does not rise to the level of "reason to know" within the meaning of the ICWA.

In addition, the mother argues, relying on the Federal regulations and O'Coin's, Inc. v. Treasurer of the County of Worcester, 362 Mass. 507, 510 (1972), that the trial judge breached an affirmative duty to order the court investigator to research the twins' Indian status.  We discern no such duty. The applicable Federal regulations require judges merely "to ask participants in the proceeding if they know or have reason to know that the child is an 'Indian child,'" 81 Fed. Reg. 38778, 38805 (2016), as was done here.  Any further investigation is within the court's discretion.  "States or courts may choose to require additional investigation . . . and may choose to explain the importance of answering questions regarding whether the child is an Indian child."  Id.  While the judge could have

independently ordered further ICWA investigation, the judge did not abuse her discretion by failing to do so.

2. Issues arising from mother's criminal prosecution. The mother argues the judge abused her discretion by denying the mother's motion to continue the care and protection trial while criminal proceedings against her were ongoing. The mother relatedly maintains, for the first time on appeal, that the department was acting as an agent of the prosecution and that she was unable to engage with the department's action plan or present evidence in defense of her parental fitness without incriminating herself.

"Whether to continue any judicial proceeding is a matter entrusted to the sound discretion of the judge, and [the] decision will be upheld absent an abuse of that discretion." Care & Protection of Quinn, 54 Mass. App. Ct. 117, 120 (2002). In ruling on a motion to continue, "the judge should 'balance any prejudice to the other civil litigants which might result from granting a stay, against the potential harm to the party claiming the privilege if he is compelled to choose between defending the civil action and protecting himself from criminal prosecution.'" Id. at 122, quoting United States Trust Co. of N.Y. v. Herriott, 10 Mass. App. Ct. 313, 317 (1980).

The mother filed her motion to continue approximately two weeks before the trial began. On the first day of trial, June

22, 2021, the mother's counsel argued that the pending criminal trial, then scheduled for mid-January 2022, prevented the mother from testifying during the care and protection trial without incriminating herself, as the mother's responsibility for Amy's death would be at issue. Although the judge denied the motion without explanation, the record permits us to conclude that judge did not abuse her discretion. The care and protection petition had been pending for more than three years, and resolution of the mother's criminal case would take at least another six months. The judge could not be certain that the criminal trial would conclude within a reasonable time. See Care & Protection of Quinn, 54 Mass. App. Ct. at 122. In fact, it was not resolved for another two years. "No cases of any kind have a greater claim for expedition at all stages than those involving care and custody of children." Custody of a Minor, 389 Mass. 755, 764 n.2 (1983). See Care & Protection of Quinn, supra. The judge could properly consider that the harm of delays in such proceedings "is unfortunately suffered principally by the children." Adoption of Don, 435 Mass. 158, 170 (2001). The judge did not abuse her discretion in determining that the interests of the children in permanency outweighed the mother's desire to resolve the criminal case before the care and protection proceeding.

Nor has the mother identified any prejudice flowing from the denial of the continuance. Had the mother chosen to testify in the care and protection proceedings, her testimony could not have been used against her in the subsequent criminal case. See Care & Protection of M.C., 479 Mass. 246, 249 (2018), S.C., 483 Mass. 444 (2019) ("a parent's decision to present evidence at a care and protection proceeding does not result in a waiver of the constitutional privilege against self-incrimination at other proceedings . . . [and] a parent's prior testimony at a care and protection trial is not admissible in a subsequent criminal proceeding"). As the mother made the decision, with advice of counsel, not to testify on the grounds of self-incrimination, it was proper for the judge to draw an adverse inference from her silence. See Custody of Two Minors, 396 Mass. 610, 616 (1986); Care & Protection of Quinn, 54 Mass. App. Ct. at 123.

For the first time on appeal, the mother raises a related claim arising from her criminal prosecution. She argues that the department was acting as an agent of the prosecution, that its action plan for her was designed to elicit incriminating information, and that the judge accordingly erred by considering the mother's refusal to engage with the department as evidence of her unfitness. Because these claims were not raised at trial, they are waived. See Adoption of Mary, 414 Mass. 705, 712 (1993); Palmer v. Murphy, 42 Mass. App. Ct. 334, 338 (1997).

Even if these claims were properly before us, the record does not support them. It is true that the department is required to notify the district attorney and local law enforcement officials "if, after investigation, it has reasonable cause to believe that a child has suffered certain conditions as a result of abuse or neglect." Commonwealth v. Adkinson, 442 Mass. 410, 419 (2004), citing G. L. c. 119, § 51A, § 51B (4); 110 Code Mass. Regs. §§ 4.50-4.53 (1996). In such circumstances, the department establishes a multidisciplinary service team that includes a representative of the district attorney's office, to review and monitor the department's family action plan. See Adkinson, supra; 110 Code Mass. Regs. § 4.54 (2009).[8] In this case, an "area of focus" identified in the action plan called for the mother to "gain insight into how her lack of appropriate knowledge and understanding of childhood growth and development may have contributed to her inability to recognize that [Amy] needed immediate medical attention and how her failure to secure same likely contributed to [Amy's] death." From these facts, the mother asks us to infer that the action plan was intentionally designed by the department, working in

_____

[8] The department's regional director and the district attorney may agree to waive establishment of the multidisciplinary service team. See 110 Code Mass. Regs. § 4.54(1). Perhaps because the mother did not raise this claim at trial, there is no record evidence whether a multidisciplinary team was ever convened.

tandem with the district attorney's office, to elicit incriminating evidence, and that anything the mother said to a department social worker would be used against her in the criminal case.

The record in this case, however, is devoid of evidence, as in Commonwealth v. Howard, 446 Mass. 563, 566-569 (2006), that the department participated in obtaining incriminating information outside the presence of counsel otherwise violated the mother's rights in her criminal case. Absent such evidence, we must presume that "[t]he relationship between the department and the district attorney is not an agency relationship, but a cooperative effort intended to support the best interest of the child, not the prosecution of criminal cases." Adkinson, 442 Mass. at 420. The statutes and regulations that require the department to cooperate with law enforcement "[do] not create for the department an interest in the criminal prosecution, [nor do they] give the prosecutor any control over the department." Id. at 419. Cf. Care & Protection of M.C., 479 Mass. at 248-249, 252-256 (records of care and protection proceedings in Juvenile Court are impounded, maintained as confidential, and not to be disclosed or released for use in criminal case absent showing of good cause).

Rather, the department's efforts were appropriately directed toward "evaluating [the mother's] fitness, while at the

same time ensuring the safety of the child[ren]." Adoption of Yalena, 100 Mass. App. Ct. 542, 549-550 (2021). The mother's ability to gain insight into the circumstances of Amy's death, particularly her failure to seek timely medical attention for Amy, bore on her ability to safely care for the twins, and was therefore relevant to the evaluation of her fitness.

3. Posttermination and postadoption visitation. After finding the mother and father unfit and terminating their parental rights, the judge declined to order postermination or postadoption visition between the mother and the twins, but did order quarterly visitation among the twins and their four surviving older siblings. The mother contends that the judge abused her discretion by declining to order visitation between the mother and the twins and that the sibling visitation order was vague and unenforceable.

A "judge who finds parental unfitness to be established has broad discretion to determine what is in a child's best interests with respect to custody and visitation with biological family members thereafter." Adoption of Rico, 453 Mass. 749, 756 (2009). The purpose of posttermination and postadoption contact is not to strengthen the bonds between children and their biological parents, but rather to assist children "as [they] negotiate[], often at a very young age, the tortuous path

from one family to another."  Adoption of Vito, 431 Mass. 550, 565 (2000).

In declining to order visitation with the mother, the judge considered that the twins were exposed to significant trauma while in the mother's care; that they had not had contact with the mother since Amy's death; that the mother was unable to control her anger and behavior in the community or at trial; and that the twins, who had spent most of their lives in foster care, required stable home environments.  The judge found that the twins "do not have a strong bond" with the mother and a visitation order "would be detrimental to [their] best interests."  We discern no abuse of discretion.

The mother argues that the sibling visitation ruling is phrased as a mere suggestion, not an enforceable order.  The ruling reads in relevant part:  "In the event that the children are separated in foster, preadoptive or adoptive homes, this Court orders the children to have visitation once a quarter. This visitation should include their maternal siblings," whom the judge listed by name.  The mother contends that the word "should," rather than "must" or "shall," renders the ruling unenforceable and that the order is vague in specifying which children are entitled to visition.  We disagree.  The order makes it clear that the twins are to have quarterly visitation with each other if they are separated, and that, in any event,

they are to have quarterly visitation with their older siblings. We are confident that the order, as written, provides the department and future adoptive parents with sufficient guidance and direction to implement sibling visitation, as required by the judge, in the twins' best interests.

Finally, the mother maintains that the judge erred by declining to order posttermination contact between the twins and their maternal grandmother.  The mother's argument that the judge was required to order grandparent visitation under G. L. c. 119, § 26B (a), misconstrues that statute, which is predicated upon a request from the grandparent and a determination whether grandparent visitation is in the child's best interest.  On the record before us, neither the mother nor the maternal grandmother requested visitation between the grandmother and the twins, and as the issue was not before her, the judge made no findings whatsoever.  In any event, nothing in the evidence suggests a bond between the twins and the maternal grandmother such that visitation with her would facilitate their transition to adoption.

Decrees affirmed.
