NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-155

ADOPTION OF XICA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree entered in the Juvenile Court terminating her parental rights to her daughter, Xica, and dispensing with the need for her consent to Xica's adoption. The mother contends that (1) the judge abused her discretion by denying the mother's motion to continue the trial so that she could obtain additional evidence of her fitness; (2) the evidence did not clearly and convincingly establish that she was currently unfit to parent Xica or that her unfitness would persist indefinitely because, among other things, a number of the judge's findings are clearly erroneous and there was no evidence that the mother's substance use disorders and mental health challenges caused Xica harm; and (3) the judge erred in concluding that the Department of Children and Families

---

[1] A pseudonym.

(department) made reasonable efforts to unite the mother with Xica.[2]  We affirm.

Background.  We summarize the judge's findings and conclusions as follows.  The mother has three older children, all of whom were removed from her care by the department before Xica was born.[3]  The maternal grandmother assumed permanent guardianship of all three children, and they have been in her custody since 2020.  Xica was born in June 2023 and was one year old at the time of trial.[4]  During the course of her pregnancy with Xica, the mother was often homeless and was incarcerated for about five months, from September 2022 through February 2023.  The mother's criminal history includes charges of assault and battery, and a number of civil abuse and harassment prevention orders have been issued against her.  The mother has also experienced mental health conditions and substance use disorders for most of her adult life.  These issues led, in

---

[2] Xica has filed a brief arguing that the decree should be affirmed.

[3] This appeal does not concern these children.  However, as we discuss later, the judge made a number of findings regarding the circumstances which led to their removals from mother's care and relied on those findings in reaching her conclusions about Xica.

[4] The mother reported that her pregnancy with Xica resulted from a sexual assault by a man who never came forward for identification by the court.  That person's parental rights to Xica also were terminated.

2

part, to the removals of her older children, and they persisted during her pregnancy with Xica.[5]  At one point, when the mother was seven months pregnant, she was admitted to a hospital's crisis stabilization unit where she presented with suicidal ideations and tested positive for cocaine, cannabinoid amphetamine, and benzodiazepine.  Both Xica and the mother tested positive for amphetamine and benzodiazepine when Xica was born.  Based on a number of factors, including Xica's substance exposure at birth; the mother's criminal history, which at that time included open warrants; the persistence of the mother's mental health conditions; the mother's housing insecurity; and the continuing lack of parental capacity that led to the mother's three eldest children being placed in a guardianship with the maternal grandmother, Xica was removed from the mother's custody within a few days of her birth.  The department obtained temporary custody, and on her discharge from the hospital, Xica was placed in a kinship foster home with her maternal aunt and uncle, with whom she was living at the time of trial.  The aunt and uncle wish to adopt Xica, and they have been approved as an adoptive family.

---

[5] The mother's mental health diagnoses included posttraumatic stress disorder (PTSD), borderline personality disorder, depression, alcohol and cannabis use disorders, "Bipolar I disorder," schizophrenia, schizoaffective disorder, and attention deficit hyperactivity disorder (ADHD).

After Xica was removed from the mother's custody and the mother was discharged from the hospital, the mother was incarcerated for about two months due to a violation of probation. Thereafter, the mother entered and departed numerous treatment facilities. First, she was admitted to a short-term treatment program at a hospital, where she was diagnosed with borderline personality disorder. While she was at this first facility, the mother met with her department social worker and agreed to an interim action plan, which, among other things, required her to meet with her assigned worker monthly, inform the department of any change in address, refrain from all alcohol and nonprescribed substance use, and continue to engage with all mental health providers. The mother also agreed to postpone parenting time with Xica while she was at the first facility due to its distance from Xica's foster home. About three months later, in November 2023, a visit with Xica was held and went well. By this time, the mother had moved to a second facility, where she remained for a brief period before transferring to a third facility.[6]

---

[6] While mother was at the second facility, the department updated her action plan to include weekly attendance at alcoholics and narcotics anonymous meetings ("AA" and "NA"), attending supervised visits with Xica, and obtaining appropriate and stable housing.

4

The mother was asked to leave the third facility after a month due to an allegation that she had stolen another resident's clothing.[7]  The mother did not immediately inform the department that she had left the third facility.  A few weeks later, she contacted her social worker and informed her that she was in an inpatient program at a fourth facility.  Soon thereafter, in January 2024, the mother left that program, and by February she had relocated to a sober home (fifth facility).

Meanwhile, on January 24, 2024, the department changed the goal for Xica to adoption; it informed the mother of the change in early February.  About two weeks later, on February 22, 2024, the department learned that the mother had voluntarily left the sober home after taking Adderall in violation of the fifth facility's rules.[8]  Thereafter, the department was not aware of where the mother was living until mid-March 2024, when she relapsed by drinking alcohol and was admitted to the fourth facility for a second time.  The mother again presented with suicidal ideations.  By the end of April, the mother was transferred to a clinical stabilization service program at a

_____

[7] The mother admitted to her department social worker that she took the clothing but maintained that the clothing did not belong to anyone.  At trial, she testified that she was asked to leave the third facility because she was accused of stealing.

[8] The next day, the mother had another supervised visit with Xica, which also went well.

5

sixth facility. The mother was then transitioned to an affiliated center (seventh facility), where she had been residing for two months prior to the commencement of the termination of parental rights trial. The mother demonstrated considerable progress while residing at the seventh facility, and another visit with Xica took place on July 9, 2024, about one week after the first day of trial. This visit also went well, and the mother expressed her hope that the department would not pursue the goal of adoption.

As noted, the termination of parental rights trial occurred in July 2024. The judge heard testimony from the mother, two department social workers assigned to the family, and Xica's adoption social worker. On the basis of this testimony and numerous exhibits, the judge adjudicated Xica in need of care and protection and found that the mother was currently unfit to parent Xica, that the mother's unfitness was likely to continue into the future, and that adoption by the foster family was in Xica's best interests. In reaching her conclusions, the judge noted the mother's recent successful engagement in services but found that those recent gains were negated by substantial periods of noncompliance with action plan tasks, inability to maintain sobriety, and lack of stable and appropriate housing. In addition, the judge did not credit much of mother's testimony and specifically did not credit the mother's testimony that she

6

had been sober for over a year.  The judge further noted that at times mother was combative and uncooperative with department social workers, further undermining her progress.[9]

Discussion.  1.  Denial of motion to continue.  The mother asserts that the judge abused her discretion by denying the mother's motion to continue, which was presented orally on the first day of trial.  She argued that additional time would permit her to make further progress on her treatment, thereby demonstrating that she had the ability to care for Xica.  The department and Xica objected, both contending that Xica was entitled to permanency and that despite two months of positive gains, the mother's history of instability, unmanaged substance use disorders, and persistent mental health conditions were such that a continuance would not result in any substantial showing that the mother would become capable of parenting Xica.  The judge discussed the merits of the motion with the parties at sidebar; however, that conversation was not recorded.  Although we do not know the entirety of what was said by the judge or the parties, we nevertheless conclude that in the circumstances of

---

[9] The judge noted exhibits offered by the department that contained e-mail exchanges between the mother and one social worker, and which showed the mother repeatedly swearing, accusing the department of having a bias against her, and insulting her family members.

7

this case, the judge did not abuse her discretion in denying the motion.

"Whether to continue any judicial proceeding is a matter entrusted to the sound discretion of the judge, and [the] decision will be upheld absent an abuse of that discretion." Care & Protection of Quinn, 54 Mass. App. Ct. 117, 120 (2002). In ruling on a motion to continue, "the judge should 'balance any prejudice to the other civil litigants which might result from granting a stay'" (citation omitted). Id. at 122. See Adoption of Ursa, 103 Mass. App. Ct. 558, 568 (2023).

Here, the mother argues that the judge failed to adequately consider the prejudice to the mother that proceeding with trial would have on her ability to demonstrate her fitness to parent Xica. However, the mother did not file an affidavit in support of her motion or make an offer of proof as to what additional time might show. Nor did she renew her request when trial resumed a few weeks later. While we recognize that a judge must take a parent's recent positive gains into account, predictions about a parent's future ability to parent a child must stem from credible evidence. Here, there was little to no such evidence. In view of the mother's history of entering and leaving numerous treatment programs from the time Xica was born, and her inability to maintain sobriety despite engaging in those programs, the judge did not have an adequate basis on which to

8

conclude that additional time would produce evidence of the mother's fitness. Furthermore, although the mother is correct that the case had been pending for only a year when trial commenced, that was Xica's entire life. Xica had been residing in her preadoptive home the entire time and was entitled to an expeditious proceeding, as Xica argues in her brief. See Adoption of Raissa, 93 Mass. App. Ct. 447, 455 (2018), quoting Custody of a Minor, 389 Mass. 755, 764 n.2 (1983) ("[n]o cases of any kind have a greater claim for expedition at all stages than those involving care and custody of children").

Lastly, there is no merit to the mother's claim that the judge abused her discretion because she relied on the department's and Xica's "meritless" assertions regarding the mother's lack of consistent treatment and history of alcohol, cocaine, and medication use in denying her motion. To the contrary, the department's and Xica's assertions regarding these issues were substantiated by evidence at trial.

2. Allegedly erroneous findings of fact. Next, the mother argues that many of the judge's findings regarding the mother's unfitness are clearly erroneous. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Adoption of

9

Larry, 434 Mass. 456, 462 (2001), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993).

The mother first challenges the judge's findings regarding her lengthy history of housing insecurity, struggling to manage symptoms of mental health conditions, and use of alcohol, cocaine, and prescribed and unprescribed medications.[10]  She claims generally that these subsidiary findings were not supported by a preponderance of the evidence.  See Care & Protection of Laura, 414 Mass. 788, 793 (1993).  To the contrary, there was ample evidence establishing each of these findings.  Throughout her pregnancy with Xica, and three years after her older children were placed in guardianship because of persistent concerns that included insecure or inappropriate housing, the mother was still living without shelter until, in a span of seven months, she was incarcerated and then twice admitted to a hospital.  After Xica was born, the mother's housing remained unstable; in thirteen months she was incarcerated and moved between seven different treatment facilities.  By the time trial commenced the mother's housing may have been "stable" in the two months prior to trial, however, we do not think the judge was required to find it more

_____

[10] The mother specifically challenges the judge's findings that she was chronically homeless and in unstable housing, that she has several untreated mental health conditions, and that she had a lengthy history with substance and alcohol abuse.

10

likely than not that the mother's housing instability had been solved. With regard to the mother's mental health, the evidence demonstrated that although the mother had begun individual therapy by the time of trial, to address symptoms of her conditions that interfered with her ability to provide minimally acceptable care for Xica, she had not received consistent treatment for the years preceding trial. The judge therefore had no basis for concluding that individual therapy alone was likely to suffice. The mother was diagnosed with ADHD, depression, PTSD, and borderline personality disorder, and was hospitalized with suicidal ideations while she was pregnant with Xica and again after Xica was born. The mother's use of alcohol, cocaine, and unprescribed medications was well documented, and while the mother laudably entered various treatment facilities in an attempt to obtain and maintain sobriety, she was not successful. This contributed to her overall instability. As the judge specifically noted, the mother has "required inpatient care on multiple occasions due to relapse [and] overdose."

The mother also challenges the judge's subsidiary findings regarding the number of prenatal appointments the mother attended,[11] the mother's reason for leaving the fifth facility,

---

[11] Specifically, the mother testified that she attended eight prenatal visits, but the judge did not credit this

11

and her reasons for taking Suboxone.  With regard to these facts, the mother essentially argues that the judge should have credited the mother's testimony.  Assessing the credibility of a witness, however, is "quintessentially the domain of the trial judge," and is "close to immune from reversal on appeal except on the most compelling of showings."  Johnston v. Johnston, 38 Mass. App. Ct. 531, 536 (1995).  The mother has not made such a showing here.

Next, the mother argues that there was not clear and convincing evidence of her unfitness because some of the judge's subsidiary findings are contradicted by others.  First, the mother says, the judge found that the mother's older children were removed from her care (finding eight), yet also found that the mother signed a caregiver affidavit granting custody of those children to the maternal grandmother (finding forty-two).  The fact that in 2020 the mother agreed to permanent placement of her older children with a relative does not contradict that, years earlier, they were removed from the mother's care.  Lastly, the mother correctly argues that two findings -- (1)

---

testimony and found instead that the mother had only attended four.  In addition, the mother testified that she had to leave the fifth facility to take her prescribed Adderall, but the judge did not credit this testimony.  And, the mother testified that she was prescribed Suboxone for pain management due to her fibromyalgia and that it was unrelated to her substance use disorders, but the judge did not find that testimony credible.

12

that Xica was in the neonatal intensive care unit for a period following her birth, and (2) that the mother's social worker could not confirm the mother's location between July 10, 2023, and September 25, 2023 -- are clearly erroneous as neither is supported by the evidence.  However, the relevance of these two findings is marginal, and they do not affect the judge's overall conclusion of parental unfitness.  See Adoption of Yalena, 100 Mass. App. Ct. 542, 553-554 (2021).

3.  Nexus between mental health challenges and use of substances.  The mother next argues that the judge's findings did not establish a sufficient nexus between the mother's mental health conditions and her ability to provide for Xica, or between her substance use disorders and her ability to parent. We are not persuaded.

We recognize that a mental health condition is "relevant only to the extent that it affects the parents' capacity to assume parental responsibility."  Adoption of Luc, 484 Mass. 139, 146 (2020), quoting Adoption of Frederick, 405 Mass. 1, 9 (1989).  Here, the issue was not that the mother had received numerous mental health diagnoses and was prescribed many medications, the issue was that the symptoms of her conditions, like suicidal ideations, persisted and interfered with her ability to achieve a level of stability where Xica could be placed with her.  Because the mother had not sufficiently

13

acknowledged that the symptoms which interfere with her functioning are related to mental health conditions, she had not treated them to an extent that she could provide minimally acceptable care for herself, let alone herself and Xica. See Adoption of Luc, 484 Mass. at 146 n.17. As to the mother's use of substances, the judge properly concluded that the mother's ongoing use of alcohol, cocaine, and medication contributed to her neglect of Xica. The judge noted that Xica was born substance exposed and that the mother tested positive for illicit substances during the pregnancy.

4. Reasonable efforts. For the first time on appeal, the mother claims that the department failed to make reasonable efforts to unify her with Xica. Because this issue was not raised in a timely manner, it is waived. See Adoption of Yalena, 100 Mass. App. Ct. at 554. However, even if preserved, the claim lacks merit.

"A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous." Adoption of West, 97 Mass. App. Ct. 238, 242 (2020), citing Adoption of Ilona, 459 Mass. 53, 61-62 (2011). Such is not the case here.

The mother first argues that the department failed to schedule visits with Xica. While the mother did often ask for visits, she was not always available to attend them, due to her

14

incarceration and the fact that her initial temporary placement was at a facility located too far for Xica to travel.  At times the mother was not in communication with the department; additionally, it was difficult to schedule visits with the mother when she moved between treatment facilities almost on a monthly basis.  Moreover, even if the department did not adequately facilitate visits, where, as here, the judge's decision is based on an analysis of what is in the child's best interests, we discern no error.  See Care & Protection of Rashida, 489 Mass. 128, 133 (2022).

The mother also argues that the department did not provide her with adequate assistance in finding service providers.  While it is true that the mother secured services on her own, it was not unreasonable for the department to expect her to do so.  Furthermore, as the judge noted, the department provided support and referrals to address the mother's needs, but the mother was often resistant to such suggestions, particularly those that

were recommended to the mother to assist her in obtaining and maintaining sobriety from alcohol and nonprescribed medications.

Decree affirmed.

By the Court (Vuono, Massing & Allen, JJ.[12]),

Clerk

Entered:  November 12, 2025.

---

[12] The panelists are listed in order of seniority.