YALENA, ADOPTION OF, 100 Mass. App. Ct. 542

 
 ADOPTION OF YALENA. [Note 1]

100 Mass. App. Ct. 542
 September 15, 2021 - December 3, 2021

Court Below: Juvenile Court, Worcester Division
Present: Vuono, Blake, & Englander, JJ.

 

Adoption, Care and protection, Dispensing with parent's consent. Parent and Child, Care and protection of minor, Dispensing with parent's consent to adoption. Minor, Care and protection, Adoption. Due Process of Law, Care and protection of minor, Adoption. Department of Children & Families. Practice, Civil, Care and protection proceeding, Adoption.

In a proceeding to terminate the mother's parental rights to the child and dispense with her consent to adoption, the Juvenile Court judge's findings, taken in their totality, demonstrated that the mother was unfit to parent the child and that, for the same reasons, termination of her parental rights was in the child's best interests, in that, although the mother was never criminally charged with inflicting the child's injuries and a charge of reckless endangerment of a child was dismissed, the evidence established that the mother did not protect the child from serious harm or timely seek medical care for the child, gave implausible explanations for the child's injuries, was dishonest with the Department of Children and Families (department) and her treatment providers, and prioritized protecting herself and the father, all of which demonstrated a lack of insight into the child's circumstances and needs as well as evincing the mother's inability to protect the child from future harm; in that, further, the mother demonstrated minimal insight into her parenting deficits, failed to appreciate the effects of domestic violence in her relationship, inconsistently attended visits with the child and, when she did visit, struggled to parent the child; in that the mother inconsistently engaged with her treatment providers, and the department established a nexus between the mother's inconsistent engagement with services and her fitness to parent the child; and in that the mother's inconsistent efforts to participate in the department's service plans did not result in any measurable improvement. [549-554]

In a proceeding to terminate the mother's parental rights to the child and dispense with her consent to adoption, the mother waived her claim, raised for the first time on appeal, that the Department of Children and Families failed to make reasonable efforts to reunify her with the child, where the mother failed to raise the claim in the Juvenile Court, and where, even if the claim had been preserved, it would have failed, given that the mother did not meet her obligation to substantially fulfill her parental responsibilities (including 

 Page 543 

 seeking and using appropriate services) [554]; moreover, this court declined to consider the mother's due process claim, where she did not demonstrate the exceptional circumstances necessary to consider a constitutional question that was not raised in the trial court [554-555].

PETITION filed in the Worcester Division of the Juvenile Court Department on March 27, 2015.

 The case was heard by James G. Collins, J.

 Madeline Weaver Blanchette for the mother.

 Adelaida P. Jasperse for Department of Children and Families.

 Dawn M. Messer for the child.

 BLAKE, J. After four month old Yalena was brought to the University of Massachusetts Memorial Medical Center (hospital) with facial bruises, medical personnel discovered that she also had eleven bone fractures. The mother, Yalena's primary caretaker, denied inflicting the injuries and claimed that she did not know who did. The Department of Children and Families (department) removed Yalena from her parents' care, and placed her with a paternal great uncle and his partner (preadoptive family), where she remained throughout these proceedings. [Note 2] Following a trial in the Juvenile Court, the judge issued a decree that the mother was unfit to assume parental responsibility of Yalena, terminated her parental rights, dispensed with the need for the mother's consent to adoption, and approved the adoption plan proposed by the department. The judge also ordered that the mother could have three supervised posttermination and postadoption visitations per year. The mother appeals, claiming that the judge required her to prove that she did not injure Yalena, and did not know who did, thereby improperly shifting the burden of proof to her. She also claims that because no expert witness, department social worker, or law enforcement officer testified that the mother injured Yalena, the judge improperly speculated about the cause of Yalena's injuries. 

 The mother next argues that the judge "ignored" the fact that both expert witnesses who conducted parenting and psychological evaluations testified that they did not believe that the mother would injure Yalena. And for the first time on appeal, she claims that the department did not provide her with a meaningful pathway

 Page 544 

 to reunification, thereby violating her due process rights. [Note 3] We affirm.

 Background. We summarize the judge's detailed and thoughtful findings of fact and conclusions of law, all of which find ample support in the record. [Note 4] In November 2014, shortly after Yalena's birth, the department received a report pursuant to G. L. c. 119, § 51A (51A report), alleging neglect. Upon investigation, the department supported the allegation based on the mother's longstanding mental health history and the unsanitary conditions in her home. The case remained open for assessment, in part, to monitor compliance with the services that the department had put in place following its investigation. 

 On March 25, 2015, Yalena, then four months old, was brought to the hospital with a "big bruise on each cheek, which were bluish and purplish in color; a bruise on the bridge of her nose, which was yellow in color; and a faint bruise on her hairline." A 51A report was filed. Thereafter, the department filed a petition for emergency custody of Yalena. At that time, both parents waived their rights to a hearing, and stipulated that the department would retain custody of Yalena. After six days of hospitalization, Yalena was discharged and placed with her preadoptive family, where she has remained throughout these proceedings. Initially, the department's goal was to reunify the mother with Yalena, but the goal was changed to adoption on January 23, 2016.

 1. Yalena's injuries. At the hospital, Dr. Peter Sell, an expert in pediatrics and child abuse, conducted a complete examination of Yalena. A skeletal survey revealed eleven fractures -- five healing fractures to the ribs, two healing corner factures to the distal femur bones, and four healing fractures to the tibia and fibula bones. Dr. Sell believed some of the fractures were seven to ten days old, but he could not determine the age of the other fractures. He ruled out brittle bone disease and other underlying medical issues, and formed the opinion that the rib injuries were more likely than not the result of physical abuse, possibly due to a squeezing force or stepping on Yalena. He also opined that certain

 Page 545 

 leg fractures were caused by "a tug or a twist, something with a lot of force to it." Dr. Sell diagnosed Yalena with "inflicted injuries and child physical abuse." 

 2. The mother's explanation for Yalena's injuries. The mother was Yalena's primary caretaker; Yalena was rarely watched by anyone else. The mother described her as a happy child who did not cry or get upset. However, over the course of this case, the mother also reported that Yalena was "a bit of a handful, fussy and difficult to soothe." She admitted that she had a hard time understanding what Yalena needed when she was screaming, and that she felt overwhelmed. The mother acknowledged seeing bruises on Yalena's face as early as February 2015, and additional bruising the following month, but did not tell Yalena's pediatrician because there was "so much going on." The day before the mother brought Yalena to the hospital, Yalena was described as uncharacteristically fussy, exhibiting signs of distress, and having "a blank expression with her eyes."

 The mother denied injuring Yalena, and claimed that she did not know who did. She offered varying explanations for the injuries, all of which were dubious and unconvincing. For example, the mother said that Yalena pinched herself, hit her head on the crib, and hit herself with a toy. At one point the mother suggested that Yalena's injuries may have been the result of an assault that occurred when she was three months pregnant. [Note 5] 

 3. The mother's relationship with the father. [Note 6] Throughout the pendency of the case, the mother gave conflicting information about the father. Before Yalena was removed from her care, the mother had no concerns about their relationship or the father's parenting. At another point, the mother told the department that she had no concerns with the father's ability to parent Yalena.

 After Yalena was placed in the department's custody, however, the mother said that the father was very controlling, used drugs, and yelled and swore at Yalena. She told Dr. John Weagraff (an expert witness selected by the department) that the father was verbally aggressive, threatened to kill her, stabbed someone at a party, and drank heavily, leaving for days at a time. The mother told her psychiatrists that she was present when the father shook 

 Page 546 

then two month old Yalena. She told Dr. Jeffery Stein (her expert witness) that she suspected that the father injured Yalena, and that she felt guilty for failing to protect her, but "even with the benefit of hindsight, she [did] not know how she could've prevented [the injuries]." She told the guardian ad litem that she never had a concern about the father, but believed that he injured Yalena during a "blind fit[] of rage" caused by his use of synthetic marijuana. She also said that the father was never violent toward her, did not use drugs, and did not drink often.

 4. The mother's mental health. The mother has struggled with longstanding mental health issues, and was dishonest about what, if any, treatment she was engaged in. As a teen, the mother started individual therapy, having been diagnosed with depression, social issues, cutting behaviors, missing social cues, organization deficits, and features of bipolar disorder. The mother was taking several prescribed medications when she became pregnant; the mother's doctor discontinued her medications during her pregnancy. [Note 7] After Yalena's birth, the mother did not reengage with treatment. At the time of the court investigation, the mother had not seen a psychiatrist, and therefore had not been prescribed medication, for over a year. [Note 8] She restarted therapy six days after Yalena was brought to the hospital. [Note 9] 

 5. The mother's service/action plans. After Yalena was removed from the mother's care, the department developed eight service/action plans designed to assist the mother with reunification. Of significant import to the mother's claims discussed infra, for a period of time, the mother's service/action plans included the following: "Acknowledge harm done to child," "acknowledge responsibility for abusing the child," "acknowledge harmful effects of physical abuse on the child[]," and "understand the impact of abuse/neglect on the[] child[]'s psycho/social development." Throughout the case, the mother denied injuring Yalena.

 Additional tasks included monthly meetings with the department, signing releases to allow the department to speak with the

 Page 547 

 mother's treatment providers, visiting with Yalena, attending counseling, participating in parenting and psychological evaluations, engaging with a psychiatrist, taking prescribed medication, attending parenting classes and groups focused on children who suffered abuse, maintaining a job and housing, creating a budget, and attending foster care reviews, meetings, and court hearings. Over the four years that the case was pending, the mother was disingenuous about her engagement with her therapist and psychiatrist, as well as her medication compliance. She did not meaningfully and consistently comply with her service/action plan tasks. [Note 10] 

 The mother missed visits with Yalena due to her failure to confirm her attendance, as required by the department, or simply failed to show up for a visit after confirming it. [Note 11] When she did visit, the mother did not provide structure, had difficulty redirecting Yalena or reading her cues, and demonstrated superficial parenting skills. She also failed to enroll in parenting classes focused on the behavioral needs of traumatized children.

 Throughout the case, the mother was frequently noncompliant with home visits. After she moved in with her own parents, she did not allow the department to conduct home visits on a consistent basis. At trial, the mother testified that if she was reunited with Yalena, she planned to live with her parents, and that she had a bedroom for Yalena. When the mother permitted the department to view the home, the social worker described the designated bedroom as disorganized with an excess of furniture in it. The room had an infant crib and baby toys in it. Notably, Yalena was over four years old at that time.

 6. The parenting and psychological evaluations. Dr. Weagraff (selected by the department) and Dr. Stein (selected by the mother) each conducted parenting and psychological evaluations of the mother. Dr. Weagraff reviewed records, conducted testing, met with the mother, and observed her with Yalena. Among other things, Dr. Weagraff concluded that the mother was immature for her age, had difficulty responding to social and emotional demands,

 Page 548 

 was easily overwhelmed, was unable to see her own faults, and did not feel she needed assistance. He opined that the mother's reluctance to acknowledge that she needed help inhibited her ability "to collaborate and cooperate with service providers." Dr. Weagraff was "struck" by the mother's lack of "anguish or upset" when discussing Yalena's injuries. He testified that the mother did not display distress or expressions of guilt, and accepted very little responsibility. He made a series of recommendations, which the department included in the mother's amended service/action plan. The mother did not follow through with several of Dr. Weagraff's recommendations, including that she attend a parenting class focused on behavioral needs of traumatized children. 

 Dr. Stein was retained by the mother to update her parenting and psychological evaluation; however, she gave Dr. Stein access to her records only through 2015. Additionally, the mother provided Dr. Stein with inaccurate and misleading information when he interviewed her. Dr. Stein observed one visit between the mother and Yalena. He also talked to department social workers and read Dr. Weagraff's evaluation. Dr. Stein acknowledged that his opinion was based, in part, on the mother's self-reporting, and that until the time of trial, he was unaware of her inconsistent and untruthful statements about her mental health treatment, chronic disorganization, inconsistent visits with Yalena, and lack of collaboration with the department and service providers. Dr. Stein acknowledged that this new information affected his opinion as to the mother's "organizational capacity to structure her own life and her daughter's life in order to [safely] parent Yalena."

 7. Yalena's needs. Yalena has been in the care of her preadoptive family since her discharge from the hospital. She received early intervention services focused on her speech delay and gait. At the time of trial, Yalena was under the care of a pediatrician and two specialists. Dr. Brian Rachmaciej, an expert in bonding, attachment, and parenting capacity, opined that Yalena had "a strong, secure reciprocal" bond with her preadoptive family, whom he described as highly skilled caregivers. [Note 12] Dr. Rachmaciej opined that the mother had an inadequate understanding of the trauma that Yalena endured, and would be unable to alleviate the harm Yalena would suffer if she was removed from her preadoptive home. 

 Page 549 

 Discussion. 1. Termination of parental rights. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). On appeal, "[w]e give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). 

 The mother principally argues that although she eventually acknowledged that Yalena's injuries "were inflicted," the department improperly required her to either confess to injuring Yalena (something she denied) or disclose who did (something she claimed she did not know). She claims that the department "placed an insurmountable hurdle to reunification" by requiring her to "acknowledge responsibility for abusing" Yalena. The mother's claim is best exemplified in the February 2016 service/action plan that stated that the mother "will acknowledge responsibility for abusing the child." This argument, in isolation, has some force. [Note 13] Indeed, if it were true that the mother did not injure Yalena and did not know who did, she would never be able to complete the task. [Note 14] While we agree that this task could create an impossibility (if the mother's claims were true), the myriad of other service/action plan tasks were appropriately designed to address the department's protective concerns. We observe that the mother does not claim otherwise.

 A service/action plan must focus on evaluating a parent's

 Page 550 

 fitness, while at the same time ensuring the safety of the child. [Note 15] See generally Care & Protection of Walt, 478 Mass. 212, 219-221 (2017); 110 Code Mass. Regs. §§ 7.000 (2011). [Note 16] The question of who inflicted Yalena's injuries was a necessary and inescapable part of the child abuse investigation. But the department should reconsider the usefulness of including a task that requires the mother to "acknowledge responsibility for abusing" the child. If the mother is telling the truth, the task is impossible. If she is not, the task has important Fifth Amendment to the United States Constitution implications for the mother. Cf. Care & Protection of M.C., 479 Mass. 246, 261-262 (2018), S.C., 483 Mass. 444 (2019). In any event, the mother's fitness can be evaluated without imposition of such a task.

 Relying on Adoption of Iris, 43 Mass. App. Ct. 95 (1997), S.C., 427 Mass. 582 (1998), the mother contends that the judge's finding of unfitness rested solely on Yalena's injuries, and therefore the decree must be vacated. This claim is belied by the record, which reflects the multiple bases upon which the judge relied in reaching his conclusion. In Adoption of Iris, the department obtained custody of the one month old child after she sustained a serious head injury. See id. at 95-96. The initial goal was to reunify Iris with her parents, but it was later changed to adoption. See id. at 96. The trial judge terminated the parents' rights. See id. at 95, 100. We held that the evidence and findings of fact were insufficient to support by clear and convincing evidence "the grave conclusion of unfitness" (citation omitted),

 Page 551 

 id. at 96, and reversed and remanded the case to the Juvenile Court, id. at 106. Unlike the facts here, the evidence did not establish a precise time frame during which Iris was injured, there were no visible injuries to Iris, and Iris displayed no symptoms of distress. See id. at 103. In addition, there was insufficient evidence that Iris was in the exclusive custody of her parents when she was injured. See id. at 102. Because there was no evidence as to the degree of force necessary to cause the injury to Iris, and the evidence was inconclusive as to whether the injuries were accidental or inflicted, the judge was required to improperly speculate as to the cause of the injuries. [Note 17] See id. at 103-106. 

 Our holding in Adoption of Lorna, 46 Mass. App. Ct. 134 (1999), is instructive. In Adoption of Lorna, a hospital examination revealed that Lorna's younger sister, Abby, had several recent and older bone fractures. See id. at 136. Medical evidence established that Abby's injuries were inflicted and not accidental. See id. at 136, 139. Abby was in the exclusive care of her parents during the relevant time frame. See id. at 139-140. There, we upheld the trial judge's decision to terminate parental rights as to both Lorna and Abby. See id. at 135, 143. As in this case, that decision was not limited to whether the parents were the cause of Abby's injuries, but also relied upon the parents' inability to protect the children from future abuse, and the parents' inability to utilize services offered by the department. See id. at 140-141, 143.

 In addition, Lorna's mother -- like Yalena's mother -- vacillated on whether the father was the cause of Abby's injuries. See id. at 140. She gave unrealistic explanations for the cause of Abby's injuries, which we described as "underscor[ing] her inability to protect her children." [Note 18] Id. at 140. "This conclusion [was] all the more compelling when viewed in light of [the mother's] inability to shield herself from abusive men." Id. Indeed, "[t]he mother's refusal to accept responsibility for failing to 

 Page 552 

recognize and avoid circumstances having high potential to jeopardize the safety and well-being of her children," as is the case here, supported the judge's decision to terminate her parental rights. Id. at 140-141. 

 Here, although the mother was never criminally charged with inflicting Yalena's injuries, and a charge of reckless endangerment of a child was dismissed, the evidence established that the mother did not protect Yalena from serious harm, nor did she timely seek medical care for her. She gave implausible explanations for Yalena's injuries, was dishonest with the department and her treatment providers, and prioritized protecting herself and the father, all of which demonstrated a lack of insight into the child's circumstances and needs. Importantly, this also evinced the mother's inability to protect Yalena from future harm. See Adoption of Lorna, 46 Mass. App. Ct. at 140. Cf. Adoption of Chad, 94 Mass. App. Ct. 828, 840, 841 (2019) (parental rights cannot be terminated based on unproven allegations).

 Regardless of the circumstances of Yalena's injuries, the record supports the judge's finding that the mother demonstrated minimal insight into her parenting deficits. See Care & Protection of Vick, 89 Mass. App. Ct. 704, 708 (2016) ("The mother's ongoing refusal to acknowledge her shortcomings and to participate in [department] remedial programs further supports the inference that her parental deficiencies remain unaddressed"). The mother failed to appreciate the effects of domestic violence in her relationship. See Adoption of Zak, 87 Mass. App. Ct. 540, 543 (2015), S.C., 90 Mass. App. Ct. 840 (2017) ("It is well documented that witnessing domestic violence, as well as being one of its victims, has a profound impact on children. [A] child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm" [citations omitted]). The mother inconsistently attended visits with Yalena, and when the mother did visit, she struggled to parent Yalena. See Adoption of Frederick, 405 Mass. 1, 7 (1989) (mother's inability to engage or interact with child during visits is evidence of unfitness); Adoption of Darla, 56 Mass. App. Ct. 519, 522 (2002) (failure by parents to visit child relevant to finding of parental unfitness). The mother inconsistently engaged with her treatment providers, and the department established a nexus between the mother's inconsistent engagement with services and her fitness to parent Yalena. See Adoption of Luc, 484 Mass. 139, 146-147 (2020) (failure to recognize need for or to engage consistently in treatment is relevant to determination of unfitness);

 Page 553 

 Adoption of Frederick, supra at 9 (mental disorder relevant to extent "it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs"). Notwithstanding the mother's inconsistent efforts to complete her service/action plans, "[m]ere participation in . . . services does not render a parent fit" unless the parent shows some "appreciable improvement in her ability to meet the needs of the child[]" (citation omitted). Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019). Here, the mother's efforts did not result in any measurable improvement. The judge properly considered her "past conduct, medical history, and present events to predict future ability and performance as a parent." Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998). 

 The record likewise supports the judge's findings and ultimate conclusion that the termination of the mother's parental rights was in Yalena's best interests. See G. L. c. 210, § 3 (c). "[T]he best interests analysis . . . requires a court to focus on the various factors unique to the situation of the individual for whom it must act." Custody of a Minor, 375 Mass. 733, 753 (1978). "The 'parental fitness' test and the 'best interests of the child' test are not mutually exclusive, but rather 'reflect different degrees of emphasis on the same factors.'" Adoption of Rhona, 57 Mass. App. Ct. 479, 490 (2003), S.C., 63 Mass. App. Ct. 117 (2005), quoting Care & Protection of Three Minors, 392 Mass. 704, 714 (1984). All of the reasons that the mother was deemed unfit also apply with equal if not greater force to the best interests analysis, particularly in view of the nature of Yalena's injuries. 

 Finally, the mother argues that some of the judge's findings are erroneous. She identified one finding with specificity that we addressed in note 5, supra. To the extent that she broadly argues that other findings are clearly erroneous, we note that a finding of unfitness may stand if, as is the case here, termination remains supported by other clear and convincing evidence. See Adoption of Peggy, 436 Mass. 690, 701-702, cert. denied sub nom. S.T. v. Massachusetts Dep't of Social Servs., 537 U.S. 1020 (2002); Adoption of Helen, 429 Mass. 856, 860 (1999) ("although the judge's findings on [some] points may have been erroneous, the judge's over-all conclusion of parental unfitness is fully supported by the record"); Care & Protection of Olga, 57 Mass. App. Ct. 821, 824-825 (2003) (even without erroneous findings judge's conclusion of unfitness had "clear and convincing evidentiary support"). Taken in their totality, the judge's findings demonstrate

 Page 554 

 that the mother was unfit to parent the child, and that termination of her parental rights was in Yalena's best interests. See Adoption of Jacques, 82 Mass. App. Ct. at 606. [Note 19] 

 2. Reasonable efforts and due process. For the first time on appeal, the mother claims that the department failed to make reasonable efforts to reunify her with Yalena. "Reasonable efforts [are] generally understood to include accessible, available, and culturally appropriate services that are designed to improve the capacity of families to provide safe and stable homes for their children and to ensure that parents and other family members . . . are making progress on case plan goals" (quotations and citation omitted). Care & Protection of Rashida, 488 Mass. 217, 219 (2021). Here, the mother did not raise this claim in the Juvenile Court and, therefore, it is waived. A claim of inadequate services must be raised in a timely manner to provide the judge and the department the opportunity to make accommodations while the case is pending. See Adoption of West, 97 Mass. App. Ct. 238, 242 (2020). See also note 14, supra. 

 However, even if preserved, this claim would fail on the facts of this case. The department's obligation to make reasonable efforts to reunify the child with the mother is contingent upon her obligation to substantially fulfill her parental responsibilities (including seeking and using appropriate services). As discussed supra, the mother did not fulfill these responsibilities here. See Adoption of Daisy, 77 Mass. App. Ct. 768, 782 (2010), S.C., 460 Mass. 72 (2011) (department's reasonable efforts obligation is contingent upon parent's obligation to fulfill various parental responsibilities). Moreover, even if the department failed to make reasonable efforts to reunify the mother with Yalena, a judge's decision must include an analysis of what is in the child's best interests, as it did here. See Adoption of Ilona, 459 Mass. at 61. See also G. L. c. 119, § 29C.

 The mother's due process claim -- which, at bottom, is a repackaging of her reasonable efforts argument -- fares no better. The mother has not demonstrated the exceptional circumstances necessary for us to consider a constitutional question that was not raised in the trial court. See Petition of Dep't of Soc. Servs. to

 Page 555 

 Dispense with Consent to Adoption, 392 Mass. 696, 697 (1984) (issues, particularly constitutional questions, raised for first time on review are not considered, barring exceptional circumstances); Adoption of Leland, 65 Mass. App. Ct. 580, 588 (2006) (due process claim waived when not raised at trial).

Decree affirmed.

FOOTNOTES
[Note 1] A pseudonym. 

[Note 2] The judge approved the department's plan for the paternal great uncle and his partner to adopt Yalena. 

[Note 3] The father stipulated to his unfitness and the termination of his parental rights. He is not a party to this appeal. 

[Note 4] The case was tried over seven days between June and August 2019. Ten witnesses testified, including four expert witnesses; fifty-two exhibits were admitted in evidence. The judge entered 460 findings of fact and forty-two conclusions of law. 

[Note 5] The mother contends that the judge erred in attributing this statement to her; however, the judge's finding is consistent with the mother's testimony. 

[Note 6] The mother became pregnant with Yalena three weeks after she began dating the father. She lived with the father in his parents' home until shortly after the department removed Yalena. The mother then moved in with her parents. 

[Note 7] The mother cut herself twice during her pregnancy. First, she said it was due to the stress of her relationships with her parents and the paternal family. At trial, she said it was due to the father's infidelity. 

[Note 8] The mother admitted that she self-medicated with an old prescription of Trazadone. 

[Note 9] The department organized intensive in-home therapy services that ended because the mother lost her insurance. 

[Note 10] For example, there were large gaps in time between appointments with the mother's psychiatrist. Due to the inconsistent appointments, the mother had large gaps in her medication treatment. She also refused to sign releases, or allowed only limited records to be released. 

[Note 11] By way of example, the mother did not visit Yalena for a four-week period between August and September 2016. She also did not visit Yalena for nearly the entire months of August 2018, October 2018, and February 2019. 

[Note 12] The mother did not permit Dr. Rachmaciej to observe her with Yalena. 

[Note 13] We address, infra, a parent's responsibility to ensure that anyone who cares for a child does so without inflicting harm. If the mother did not inflict these injuries, then she failed to adequately protect Yalena, and the department demonstrated that nothing in the subsequent four years rectified this risk. 

[Note 14] The mother could have addressed this issue by filing an abuse of discretion motion in the Juvenile Court, in order to give the department the ability to address her concern. Cf. Care & Protection of Rashida, 488 Mass. 217, 221 (2021), quoting Adoption of West, 97 Mass. App. Ct. 238, 242 (2020) ("Parents have 'many avenues available to raise a claim of inadequate services,' particularly a motion for a finding that the department abused its discretion"). The mother did not do so. 

[Note 15] The department's "Principles of Service," 110 Code Mass. Regs. § 1.02 (2008), provide in pertinent part: "In delivering services to children and families the [d]epartment shall: (1) seek to ensure the safety of children; (2) recognize that, consistent with the need to ensure the safety of children, the family is the best source of child rearing, and so require that [S]tate intervention into a family unit be used only when it is clearly needed to protect a child; (3) reflect the understanding that every child needs stability and permanency . . . . The [d]epartment seeks to assist parents in meeting their parental responsibilities, among which are: (5) to maintain meaningful contact with the child(ren); (6) to seek and utilize appropriate services to assist family reunification; (7) to make good faith efforts to participate with the [d]epartment in developing and implementing a service plan . . . ." 

[Note 16] "[A]n individual service decision is committed to the discretion of the department. . . . The department is authorized to promulgate rules and policies necessary for the full and efficient implementation of programs . . . in the area of social services . . . . The department offers specific services to parents and families in order to fulfill that obligation" (quotations and citations omitted). Care & Protection of Rashida, 488 Mass. 217, 222 (2021). 

[Note 17] In Adoption of Iris, 43 Mass. App. Ct. at 104, the parents had no (1) history of child abuse or neglect, (2) criminal record, (3) substance misuse, (4) social service history, or (5) untreated mental health issues. They were truthful and cooperated with the department about Iris's injuries. See id. at 104-105. 

[Note 18] When Lorna was nine months old and in the sole custody of the mother, she was diagnosed with multiple leg fractures. See Adoption of Lorna, 46 Mass. App. Ct. at 135. The mother told the medical staff that Lorna "sustained the injuries by pulling a chair onto herself while trying to stand." Id. The judge found the mother's explanations for Lorna's injuries "implausible, incredible and inconsistent with the medical diagnosis." Id. at 142. 

[Note 19] To the extent that the mother's claims rest on the credibility determinations made by the judge and the weight he gave to the evidence, we defer to the judge, who was in the best position to assess the evidence and the witnesses. See Adoption of Larry, 434 Mass. 456, 462, 469 (2001). Our review is not de novo. See Adoption of Paula, 420 Mass. 716, 730 (1995). 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.