NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1429

ADOPTION OF MALORIE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This is an appeal by the mother from a decree of the Juvenile Court adjudicating her daughter (Malorie) under G. L. c. 119, § 26, to be in need of care and protection, finding the mother unfit to care for the child, terminating the mother's parental rights to the child, awarding permanent custody of the child to the Department of Children and Families (DCF), and approving DCF's plan for the child's adoption by her kinship foster parents.[2]

Before turning to the mother's merits arguments, we must address a jurisdictional question. The child was born in Massachusetts, and the family had some contact with DCF while

_____

[1] A pseudonym.

[2] The trial judge also terminated the rights of the child's father, who did not appeal.

they lived here, but they subsequently moved to Washington State in August, 2020.

In January, 2021, the father was charged with pushing the mother out of a moving car. A Washington court issued a restraining or stay away order prohibiting the father from coming into contact with the mother. Later in 2021, the parents, with the child, went to Oregon, and from there they traveled to Massachusetts, bringing all of their possessions. Although it is not material to the jurisdictional question, the trial judge concluded that they intended permanently to stay in Massachusetts.

On July 24, 2021, the parents and the child showed up, without prior notice, at the Massachusetts home of the child's paternal grandmother. The next day, the paternal grandmother called the police. The father had refused her request to leave and was drinking alcohol, and was naked, aggressive, had urinated inside the home, and had punched a hole in the door. She obtained a restraining order against the father barring him from her home.

Shortly after the family left the paternal grandmother's home, a G. L. c. 119, § 51A, report was filed alleging that the father went to the emergency room at Berkshire Medical Center due to cellulitis, and while there, he tested positive for

2

opiates, cocaine, and alcohol.  The report also alleged that there was an active restraining order in Washington requiring the father to stay away from the mother.  Despite this, the parents had been living together in motels in Oregon, then traveled to Massachusetts together, where they initially stayed with the paternal grandmother.

Due to concerns about the Washington State restraining order and the father's drug use, DCF instructed the mother to contact a nearby provider of domestic violence services and not to let the father be in the child's presence until the agency could further assess the safety risks to the child he presented. The mother agreed and signed a DCF safety plan, but after the father, against medical advice, left a detoxification center to which he had been admitted during DCF's investigation, the mother took the child to join him at a local motel.  DCF personnel went to the motel and spoke with the mother; she admitted that the father was staying with her and the child and that she had not followed the safety plan she had signed the previous day.

Because the mother had not followed the safety plan, DCF removed the child from the parents' custody at the motel based on its concerns about the father's substance use, incidents of domestic violence, and the Washington restraining order.  The

3

child was placed in a Massachusetts foster home.  The underlying care and protection petition was filed by DCF on July 30, 2021.

By late October 2021, the mother and the father had returned to Washington.  The child remained in Massachusetts, where she had been placed with a family member of the father. When the child's maternal aunt heard that the child could not stay there any longer, she applied to become the child's foster parent in Washington.  After undertaking a home study pursuant to the Interstate Compact on the Placement of Children (ICPC), St. 1963, c. 452, § 1, in March, 2022, DCF placed the child with her aunt and uncle in Washington, pursuant to that statute.

The first question before us is whether, despite the entire family now living in Washington State, the Massachusetts Juvenile Court could exercise jurisdiction to hear this case and order the termination of parental rights.  We conclude that it properly exercised its jurisdiction here.

"A Massachusetts court's exercise of jurisdiction over custody determinations must be based solely on . . . 'any of the four subsections of G. L. c. 209B § 2 (a).'"  MacDougall v. Acres, 427 Mass. 363, 366 (1998), quoting Guardianship of Zeke, 422 Mass. 438, 441 (1996).  The first basis is contained in G. L. c. 209B, § 2 (a) (1).  It confers jurisdiction on the courts of the Commonwealth if this is the subject child's "home

4

state," which is "the state in which the child immediately preceding the date of commencement of the custody proceeding resided with . . . a parent, . . . for at least 6 consecutive months," G. L. c. 209B, § 1, or "had been the child's home state within six months before the date of the commencement of the proceeding and the child is absent from the commonwealth because of his or her removal or retention by a person claiming his or her custody or for other reasons, and a parent or a person acting as a parent continues to reside in the commonwealth." G. L. c. 209B, § 2 (a) (1). As the child had been in the Commonwealth for only a matter of days at the time of the commencement of this proceeding, Massachusetts was not her home state.

Under the second basis in G. L. c. 209B, § 2 (a) (2), a Massachusetts court could have jurisdiction if it "appears that no other state would have jurisdiction under [§ 2 (a) (1)]," which has been interpreted to mean that no other State would have jurisdiction applying the standards that are articulated for the Commonwealth to have jurisdiction under § 2 (a) (1). See Custody of Victoria, 473 Mass. 64, 70-72 (2015). Under that standard, Washington State would have had jurisdiction, so § 2 (a) (2) is not a basis upon which the Juvenile Court could have exercised jurisdiction over this case.

The third basis is contained in G. L. c. 209B, § 2 (a) (3), which provides for so-called "emergency jurisdiction"; it allows the exercise of jurisdiction when

> "the child is physically present in the commonwealth and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child from abuse or neglect for other good cause shown, provided that in the event that jurisdictional prerequisites are not established pursuant to any other paragraph of this subsection and a court of another state shall be entitled to assert jurisdiction under any other subparagraph of this paragraph then a court exercising jurisdiction pursuant to this clause of paragraph (3) may do so only by entering such temporary order or orders as it deems necessary unless the court of the other state has declined to exercise jurisdiction, has stayed its proceedings or has otherwise deferred to the jurisdiction of a court of the commonwealth."

The parties agree that the Juvenile Court properly exercised emergency jurisdiction when it initially removed the child and placed her with family who lived locally.  The mother, however, contends that Washington State did not "decline to exercise jurisdiction," G. L. c. 209B, § 2 (a) (3), and so the Juvenile Court was empowered only to enter temporary orders.

We disagree.  A State declines to exercise jurisdiction when a court of competent authority communicates that declination.  See MacDougall, 427 Mass. at 369 & n.7.  The trial judge properly and repeatedly contacted by Zoom, on the record and in the presence of counsel, the Commissioner of the Lewis County Superior Court (Commissioner), the official in charge of making these jurisdictional determinations under the Uniform

6

Child Custody Jurisdiction and Enforcement Act, in the court in which a case against the parents would lie in Washington State. The Commissioner expressly "declined to exercise jurisdiction" early on when the entire family was still in Massachusetts. Subsequently, after the entire family was in Washington State, which was a relevant circumstance, she again declined to exercise jurisdiction despite the strong suggestion by the trial judge that her court exercising jurisdiction that might be the more prudent course. The Commissioner said that she could not accept jurisdiction because there was no case pending in her court. She explained that in the absence of a current emergency, the Washington counterpart to DCF would not file a case equivalent to the care and protection proceeding. She did suggest that the foster parents could file a guardianship petition in her court and that she could accept jurisdiction and hear that case -- but dismissal of this case upon such filing would have left the child in the parents' legal custody and the foster parents did not do so. In the absence of a pending case, the Commissioner explained she could not accept jurisdiction.

We conclude that the Commissioner declined jurisdiction within the meaning of the statute. Although she said she was not procedurally "declin[ing] [to exercise] jurisdiction," G. L. c. 209B, § 2 (a) (3), her determination of the meaning of that

7

phrase is not controlling before us. She was repeatedly offered the opportunity to take jurisdiction of the case and she declined to do so.

The jurisdiction at issue is "jurisdiction to make a custody determination by initial or modification judgment." G. L. c. 209B, § 2 (a). The Commissioner declined to exercise that jurisdiction. Her reasons for declining -- no pending case -- are immaterial. Whether her conclusions that she could not exercise jurisdiction without a pending case and that Washington's child protective services agency could not bring a case were correct or incorrect as a matter of Washington law, is also immaterial. We find it troubling and surprising that where a care and protection case is already pending in one State, there appears to be no simple mechanism for transferring the issues of parental fitness and remedies, including termination of parental rights, to a State to which the child and parents have moved, either by initiation of a case or some other method of exercising jurisdiction. Nonetheless, when offered the opportunity to exercise jurisdiction, the Commissioner declined. In addition, as the child points out, if this were not a declination of jurisdiction, the Commissioner certainly "otherwise deferred to the jurisdiction of a court of the commonwealth." G. L. c. 209B, § 2 (a) (3). The exercise of

8

jurisdiction to finally decide the matter by the Juvenile Court was therefore appropriate under G. L. c. 209B, § 2 (a) (3).[3]

The mother next argues that the court should have declined jurisdiction under G. L. c. 209B, § 7 (a).  In relevant part, that provision reads, "[a] court which has jurisdiction pursuant to section two may decline to exercise its jurisdiction at any time prior to making a custody determination upon finding that its assumption of jurisdiction . . . would constitute an inconvenient forum and that a court of another state would constitute a more convenient forum."  G. L. c.  209B, § 7 (a).

This provision says that a court "may" decline to exercise jurisdiction, not that it "shall" decide not to exercise jurisdiction, in certain circumstances but, even if the statute were mandatory, the mother would not have been entitled to declination.  Even if Massachusetts were "an inconvenient forum" in this case, because no court of any other State had a mechanism for hearing the case, no "court of another state would constitute a more convenient forum."[4]  G. L. c. 209B, § 7 (a).

---

[3] Therefore, we need not address the mother's argument that jurisdiction was improper under G. L. c. 209B, § 2 (a) (4).

[4] Indeed, among the things a court may do upon a finding that a court of another jurisdiction may be a more appropriate forum is "stay the proceeding upon condition that a custody proceeding be initiated or prosecuted in another state in a timely manner or upon any other condition that the court might deem just."  G. L. c. 209B, § 7 (e) (3).  Section 7 (c) also

9

Having been told by the Commissioner of the Washington court that local Washington child protective services authorities could not initiate prosecution of a case seeking to terminate the parental rights of the parents, there was no abuse of discretion or other error of law in the judge's refusal to decline jurisdiction under § 7.

Turning then to the merits, the mother argues first that DCF failed to make reasonable efforts to reunite the family. Her primary objections are that DCF did not provide supervision so that supervised, in-person visits could take place, did not identify service providers in Washington State who would provide services to the parents, and did not arrange for a social worker in Washington State for the mother. These are all services that DCF can and does provide in Massachusetts.

What is reasonable of course depends on all the facts and circumstances. The question is whether, given the fact that the family lived in Washington State because the parents moved back to Washington after DCF removed the child and DCF eventually

---

provides that "[i]n order to determine whether it is the appropriate forum, a court of the commonwealth may, in its discretion, at any time during the pendency of the custody proceeding, communicate and exchange information with a court or courts of any other relevant jurisdiction."

10

placed the child with a kinship placement in Washington State, the actions taken by DCF were reasonable.

In the end, we think they were. The social worker provided a mechanism for Zoom visits between the parents and the child that was utilized rarely by the parents. She provided the name and contact information for a service provider in the city in which the parents were living. Although she did not contact the service provider herself, the parents told the social worker they did not need this service provider. To be sure, the DCF social worker did not directly ask DCF's counterpart department in Washington State for help identifying services for the parents or if they would do a courtesy visit to either the mother or the father, although the mother has not put in any evidence that that agency could have done so. That Washington agency, however, did, pursuant to the ICPC, provide a social worker to visit the foster parents' household. Nonetheless, we think the efforts taken by DCF in the circumstances were reasonable.

As to the lower court's decree, the mother does not contest that the facts as found by the trial judge would suffice to support, by clear and convincing evidence, the judge's determination of unfitness likely to continue indefinitely into the future, and the judge's conclusion that the best interests

11

of the child required termination of parental rights.  Rather, the mother argues that a number of the lower court's findings were clearly erroneous, and conclusions of law were in error. We address them seriatim.

Most of the claimed errors about findings do not address findings of fact, but legal conclusions -- for example, the judge's conclusion that the "lack of a specific referral in the State of Washington [for] domestic abuse services is not fatal to a finding of reasonable efforts."  These claims, with respect to reasonable efforts, are all subsumed within our conclusion that there was no abuse of discretion or error in the judge's ruling that DCF had made reasonable efforts to reunify the family.  The mother also argues that it is incorrect that the Washington court declined to exercise jurisdiction.  Again, our prior discussion of G. L. c. 209B, § 2, covers that legal issue.

The mother argues that it was error for the judge to state that the social worker from DCF identified providers local to the parents when all she did was find an agency on the Internet, to which she referred the parents, without contacting it.  But that finding of fact is not clearly erroneous.  She argues that the judge incorrectly concluded that 7:00 A.M. virtual visits are not inappropriate because they would not be held in Massachusetts at that time because the social worker does not

arrive at work until 9:00 A.M. Eastern Time.  But the fact that the social worker would not schedule 7:00 A.M. visits in Massachusetts because of her work hours does not demonstrate that where, due to the time difference with Washington State, she is able to do so, such visits by Zoom at that hour are inappropriate.

Finally, the mother argues that attending only six of twenty-five virtual visits should not be treated as evidence of the mother's neglect.  First, she argues the visits were held at 7:00 A.M.  But there was no evidence that the time of day affected the mother's attendance.

Second, she argues that some of the documentation concerning the social worker opening a Zoom meeting, and leaving it open for fifteen minutes during which time the parents did not arrive for the meeting, indicated that she may not have waited the full fifteen minutes before closing the meeting.  But in the absence of any claim or evidence that either parent tried to get on a Zoom meeting but it was closed, that argument has no merit.

Third, she says that visits continued on Fridays for many weeks after the mother indicated that that day of the week would not work for her because of her work, with the social worker failing during that time to respond to her request that it be

changed. First of course, the judge did not have to credit anything in the mother's testimony, see Custody of Eleanor, 414 Mass. 795, 799 (1993), but even if the allegation is true, we would find that any error was not prejudicial.

The trial judge, in fact, did not credit the mother's testimony that she never heard back from the social worker, and found, instead, that the social worker called the mother after learning that Fridays would not work for her, and the mother did not answer her phone. We may assume without deciding that the social worker should have tried to reach the mother again to discuss this scheduling issue. But even if the mother had been able to and did attend the visits after she told the social worker the scheduled time conflicted with her work schedule, it would not be sufficient to overcome the grievous shortcomings due to unaddressed opioid addiction and mental health issues, that support the judge's ultimate conclusion that termination of the mother's parental rights was in the child's best interests. See Adoption of Yalena, 100 Mass. App. Ct. 542, 553 (2021).

Finally, the mother challenges the court's conclusions as to several of the fourteen factors set forth in G. L. c. 210, § 3 (c), particularly factors (ii), (v), (vi) and (viii). She argues that they do not apply as they depend on the parent having been offered services. As described above, the services

14

offered by DCF, while limited, largely due to the fact that the parents and the child were all in Washington State, were sufficient not only to constitute reasonable efforts to reunify the family, but to meet the requirements for the offering or provision of services identified in factor (ii). Even when the parents were receiving services throughout the case, purportedly to address their opioid addictions and other drug and alcohol abuse, they failed to provide releases allowing DCF to determine whether they had made progress or whether "a substantial danger of abuse or neglect continue[d] to exist." G. L. c. 210, § 3 (c) (ii).

As to factor (v), the parents did receive some services, but they were unable to utilize them on a regular and consistent basis, including because they were evicted from the sober house they were in, apparently due to suspected drug use and theft. Those same services, and the inability to utilize them on a regular and consistent basis, are the prerequisite for the application of factor (vi). Factor (viii) refers only to "a lack of effort by a parent . . . to remedy conditions which create a risk of harm due to abuse or neglect of the child[,]" and that was clearly demonstrated in the judge's findings. G. L. c. 210, § 3 (c) (viii).

Lastly, the mother challenges the application of factor (iii), which addresses parents who "have not maintained significant and meaningful contact with the child during the previous six months."  G. L. c. 210, § 3 (c) (iii).  The mother points to the Friday visits, which she said she could not attend due to a change in her work schedule three months before the trial.  But her history of inconsistent visitation with the child stretches back to the beginning of this case.  She attended only one in-person visit while she and the child were both in Massachusetts, despite the social worker's efforts to schedule more visits, and after the parents and the child were in Washington, she failed regularly to attend virtual visits.  Application of that factor therefore was not in error.

Decree affirmed.

By the Court (Rubin,
  Desmond & Singh, JJ.[5]),

*Paul Little*

Clerk

Entered:  December 23, 2024.

---

[5] The panelists are listed in order of seniority.