NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1373

ADOPTION OF JODY.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found that the mother was unfit to parent her son, Jody, and that his best interests would be served by the termination of her parental rights.  The mother appeals from the decree, arguing that the judge's unfitness determination relied on conclusions about her mental health, despite insufficient factual findings on that issue. Because the judge found that the mother failed to seek evaluation or treatment for her mental health concerns, as opposed to finding she had a specific mental health diagnosis, we conclude the record amply supported the judge's finding of unfitness and affirm.

Background.  We set forth the facts found by the Juvenile Court judge after trial, saving some facts for later discussion.

---

[1] A pseudonym.

In February 2023, the mother gave birth to the child.  The mother named the child after her romantic partner, whom she believed to be his biological father.  However, the partner was not listed as the father on the child's birth certificate.

By the time the child was born, the mother had struggled with substance misuse for most of her life.  At the child's delivery, the mother tested positive for cocaine and fentanyl, and she was administered methadone to offset withdrawal.  Because the child tested positive for cocaine at birth, a report alleging neglect pursuant to G. L. c. 119, § 51A, was filed with the Department of Children and Families (DCF), which took emergency custody of the child.  In an interview with a DCF investigator, the mother admitted to using fentanyl two or three times per day over the past year.  The mother also said that she had been living in various motel rooms.

For more than a week following the child's birth, the mother stayed in the hospital and continued to test positive for fentanyl, opiates, and methadone.  Hospital workers soon discovered empty syringes and needles in the mother's room, and they became concerned about the mother's ongoing substance misuse.  Ten days after the child was born, the mother went outside the hospital without authorization to meet the partner for what she claimed was a "smoke break."  After the mother

returned to her room, a nurse saw three methadone pills fall out of her hand.

On February 23, 2023, at a seventy-two hour hearing, a judge granted custody of the child to the partner, on the condition that he not permit contact between the mother and the child without DCF supervision. Less than two weeks later, police officers responded to a domestic violence report of a woman striking a man on the head several times in a department store parking lot. When officers arrived, they saw that the partner had fresh, bloody scrapes on his face and was holding the child, who was about one month old. The police arrested the mother for domestic assault and battery as well as on three outstanding warrants. Later, the partner admitted to DCF that the mother had hit him. Because the partner allowed the mother to have unsupervised contact with the child, he was removed from the partner's custody and placed in a DCF foster home, where he has since remained.

In May 2023, DCF provided the mother with an action plan that tasked her with, among other things, participating in a substance abuse program, undergoing a psychological evaluation, and engaging in weekly mental health counselling. Over the next seven months, the mother failed to engage in those services, did not communicate regularly with DCF, and did not visit the child.

3

Meanwhile, in November 2023, paternity testing revealed that the partner is not the child's biological father. The child's biological father remains unknown. Up to this point, the mother had not visited the child; she testified that she did not do so because she believed her partner was the child's father and would get custody of him. The mother canceled many scheduled visits with the child and meetings with the DCF social worker.

On January 3, 2024, when the child was about eleven months old, the mother visited him for the first time. Following that visit, the mother resumed her pattern of canceling meetings with the child and DCF and testified at trial that she did so because she was either hospitalized or incarcerated. The judge did not credit the mother's testimony that she would have visited the child regularly if not for hospitalization or incarceration.

On January 30, 2024, DCF changed its goal for the child from reunification to adoption. DCF's adoption plan proposed that the child be adopted by his maternal aunt, who previously adopted one of the mother's older children. The child's foster parents support his placement with the aunt, and if for some reason the aunt cannot adopt the child, they will consider adopting him.

Four days before trial, the mother reported to DCF that she had scheduled a future appointment with a psychiatrist. That

4

day, the mother signed releases for DCF to obtain her treatment records,[2] and she visited the child for the second time. Based on the mother's having visited the child only twice during the year following his removal, the judge found that the mother "has no apparent relationship with the child."

After a March 2024 trial, a Juvenile Court judge terminated the mother's parental rights, and those of any unknown or unnamed father, and approved DCF's plan for the adoption of the child. The judge found that the mother suffered from pervasive, untreated substance misuse, as shown by her history of using fentanyl, cocaine, and heroin, and her testimony admitting to having used fentanyl as recently as March 8, 2024. In addition to the mother's untreated substance misuse, the judge based his rulings on the mother's domestic violence, criminal history, homelessness, unemployment, and failure to visit the child. The mother appeals from the decree terminating her parental rights.

Discussion. The mother argues that the judge's findings of fact and conclusions of law improperly relied on unsupported concerns about her mental health. She also contends the judge

_____

[2] The mother reported that in December 2023 she began medication-assisted treatment for her substance misuse. Shortly before trial, she signed a release for DCF to obtain those records. However, the release was not signed by a clinician, and so DCF could not use it to obtain the records. Also shortly before trial, the mother signed a release for DCF to obtain her hospital records, but as of trial DCF had not done so.

did not establish a nexus between her mental health and her unfitness as a parent.

"To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted). Adoption of Yalena, 100 Mass. App. Ct. 542, 549 (2021). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

The mother argues that out of the judge's one hundred enumerated findings of fact, "not a single one relates to or even mentions Mother's mental health." In making that argument, the mother apparently ignores the facts on that subject set forth in the introductory section of the judge's findings of fact and in his conclusions of law. Moreover, in the findings of fact section, the judge did make findings relevant to the mother's mental health. The judge found that the mother "has not completed a psychological evaluation" and "has not participated in . . . therapeutic services." The judge also

6

found that shortly before trial the mother told the DCF social worker that she had scheduled a future appointment with a psychiatrist.[3]  In light of the judge's finding that the mother had a longstanding pattern of "making claims and not following through," the judge was not required to conclude that the mother's scheduling a single psychiatric appointment amounted to meaningfully engaging in services.  See Custody of Two Minors, 396 Mass. 610, 621 (1986) ("The court is permitted to assess prognostic evidence derived from prior patterns of parental . . . misconduct in determining future fitness").  These findings did relate to the mother's mental health, and they supported the judge's conclusions of law that followed.  See Adoption of Luc, 484 Mass. 139, 147 (2020) (mother's failure to provide DCF with psychological evaluation was relevant to unfitness inquiry).

In his conclusions of law, the judge stated:  "Despite Mother's ongoing mental health concerns, she has never meaningfully engaged in mental health or therapeutic services.  She has never completed a psychological assessment to even gain an understanding of what her mental health needs or possible

---

[3] The judge did not hear evidence as to whether the mother attended that appointment.  That fact is immaterial to our analysis.

diagnoses are."[4]  Thus, the judge expressed that the mother had mental health "concerns," which could be alleviated or treated by her engaging in the services recommended on her action plan. Contrary to the mother's assertion that the judge "erroneously determined . . . that Mother has mental health issues," the judge's references to the mother's "ongoing mental health concerns" did not amount to a conclusion that she had a mental health disorder.  See Adoption of Yvonne, 99 Mass. App. Ct. 574, 580 (2021) (considering incidents of "concerning behaviors" without reaching conclusion that mother had mental health disorder).  Here, the judge made no finding that the mother suffers from "a particular condition" (citation omitted). Adoption of Zoltan, 71 Mass. App. Ct. 185, 191 (2008) (mother's alleged anger management issues not significantly supportive of unfitness).  The judge's decision, therefore, did not rely on the mother's mental health as an "improper factor."  Adoption of Eden, 88 Mass. App. Ct. 293, 296 (2015) (unproven allegation of sexual abuse was improper factor).

---

[4] The mother also challenges the following conclusions: (1) "Mother has not demonstrated any observable changes as to insight into her shortcomings, . . . [including] mental health"; (2) "Mother's lack of insight into her . . . mental health . . . continue[s] to put the child at risk of further harm"; and (3) "Mother's mental health and sobriety are a concern to this Court."

8

Rather, the significance of the judge's references to the mother's mental health concerns is that the mother failed to seek diagnosis of or treatment for those concerns.  See Adoption of Luc, 484 Mass. at 145 (affirming termination decree where judge considered parent's "ongoing pattern of untreated mental health and substance use disorders").  See also Adoption of Leonard, 103 Mass. App. Ct. 419, 423 (2023) (no error in finding that parent's untreated mental health issues endangered child).  Given the evidence that the mother did not take any diagnostic or preventative care of her mental health, by way of a psychological evaluation or other services, the judge was warranted in concluding that the mother had no "understanding of what her mental health needs or possible diagnoses are."  See Adoption of Yalena, 100 Mass. App. Ct. at 552-553 (considering parent's "minimal insight into her parenting deficits" and lack of "any measurable improvement").  See also Adoption of Flavia, 104 Mass. App. Ct. 40, 48-50 (2024) (considering parent's inability to recognize severity of her addiction).

The mother's failure to investigate her mental health also demonstrated "unwillingness to adhere to DCF's service plan, which . . . is relevant to the determination of unfitness" (quotation and citation omitted).  Adoption of Luc, 484 Mass. at 147.  Though the mother contends there is "scant evidence" showing that DCF was concerned about the mother's mental health,

9

the record shows otherwise.  DCF's action plan included tasks targeting the mother's mental health.  Yet the mother did not engage in the recommended services and often failed to communicate with DCF, leaving DCF to conclude that she was noncompliant.  See Adoption of Oren, 96 Mass. App. Ct. 842, 845 & n.5 (2020) (parent's failure to participate in therapy, as required by her action plan, was relevant to fitness inquiry).

Even if the judge's lack of a more specific finding as to the nature of the mother's "mental health concerns" amounted to error, we would consider it nonprejudicial.  See Adoption of Breck, 105 Mass. App. Ct. 652, 663 n.7 (2025).  Cf. Adoption of Bea, 97 Mass. App. Ct. 416, 426-427 (2020) (given "extensive" findings supporting unfitness, any error in admission of expert testimony was harmless).  The judge's decision was "amply supported" by subsidiary findings pertaining to the mother's substance misuse, homelessness, criminal history, domestic violence, and failure to visit the child, and each of those

findings was supported by the record.  <u>Adoption of Helen</u>, 429 Mass. 856, 859 (1999).

<u>Decrees affirmed</u>.

By the Court (Ditkoff, Hand & Grant, JJ.[5]),

Clerk

Entered:  July 30, 2025.

---

[5] The panelists are listed in order of seniority.

11